*Attorney Grievance Commission v. Garland Montgomery Jarrat Sanderson*, Miscellaneous Docket No. 3, September Term, 2018.  Opinion by Getty, J.

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT**:

Respondent, Garland Montgomery Jarrat Sanderson violated several provisions of the Maryland Lawyer's Rules of Professional Conduct ("MLRPC") and the Maryland Attorneys' Rules of Professional Conduct ("MARPC") in his representation of former clients Olugboyega Odubanjo, Sharon Ozel, Duane Wilkinson, Darren Parham, and Toumany Sangare.  He also violated these provisions with respect to a non-client Tuesday Isom-Cyrus.  Mr. Sanderson engaged in a pattern of mismanaging client funds held in escrow, including making cash withdrawals, depositing funds from his operating account to his attorney trust account, and failing to timely deliver settlement proceeds.  In addition, Mr. Sanderson failed to maintain records associated with his attorney trust account, failed to appear in court on behalf of several clients, failed to respond to requests by both Bar Counsel and clients, urged a former client to provide Bar Counsel with misinformation in attempt to interfere with the investigation, and failed to adequately communicate with his clients.

Mr. Sanderson violated: (1) MLRPC 1.1; (2) MLRPC 1.2; (3) MLRPC 1.3; (4) MLRPC 1.4; (5) MLRCP 1.5; (6) MLRCP 1.15;  (7) MLRPC 3.4; (8) MLRPC 8.1;  (9) MLRPC 8.4; (10) Maryland Rule 19-407; (11) Maryland Rule 19-408; (12) Maryland Rule 19-410; and  Md. Code (1984, 2014 Repl. Vol.), Business Occupations and Professions § 10-306.

Circuit Court for Baltimore City
Case No. 24-C-18-002381 AG
Argued: April 5, 2019

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 3

September Term, 2018

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

GARLAND MONTGOMERY JARRAT
SANDERSON

_____

Barbera, C.J.
Greene,
McDonald,
Watts,
Hotten,
Getty,
Battaglia, Lynne A.
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, J.

_____

Filed: July 23, 2019

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Pursuant to Maryland Rule 19-721, Bar Counsel filed a Petition for Disciplinary or Remedial Action ("Petition") against Respondent, Garland Montgomery Jarrat Sanderson, in this Court on March 26, 2018. In the Petition, Bar Counsel charged Mr. Sanderson with multiple violations of the Maryland Attorneys' Rules of Professional Conduct,[1] throughout his representation of several clients, including: (i) MLRPC 1.1 (Competency); (ii) MLRPC 1.2 (Scope of Representation and Allocation of Authority Between Client and Attorney); (iii) MLRPC 1.3 (Diligence); (iv) MLRPC 1.4 (Communication); (v) MLRPC 1.5 (Fees); (vi) MLRPC 3.4 (Fairness to Opposing Party and Attorney); (vii) MLRPC 8.1 (Bar Admission and Disciplinary Matters); and (viii) MLRPC 8.4 (Misconduct). The Petition also alleged several violations of the provisions regulating attorney trust accounts including: (i) Maryland Rule 19-407; (ii) Maryland Rule 19-408; (iii) Maryland Rule 19-410; and (iv) Md. Code (1984, 2014 Repl. Vol.), Business Occupations and Professions ("BOP") § 10-306.

The charges emanated from various complaints filed with Bar Counsel against Mr. Sanderson, stretching across Mr. Sanderson's representation of several clients. Pursuant to Maryland Rule 19-722, we referred the Petition to Judge John S. Nugent of the Circuit Court for Baltimore City for a hearing to determine findings of fact and recommended

---

[1] On July 1, 2016, the Maryland Lawyer's Rules of Professional Conduct ("MLRPC") were renamed to the Maryland Attorneys' Rules of Professional Conduct ("MARPC"). Mr. Sanderson's violative conduct occurred before and after recodification of the Rules. We will therefore refer to the to the rules under the designation MLRPC as there is no substantive difference between the two.

conclusions of law. *See also* Md. Rule 19-727. The hearing spanned two days occurring on November 26 and 27, 2018.

On January 10, 2019, the hearing judge issued his findings of fact and conclusions of law. Therein, he concluded that Mr. Sanderson violated MLRPC 1.1; 1.2 (a) and (c); 1.3; 1.4(a)(1), (a)(2), and (b); 1.5(c); 1.15(a), (b), (c), and (d); 3.4;[2] 8.1; and 8.4(a), (c), and (e). The hearing judge also concluded that Mr. Sanderson violated Maryland Rules 19-410(b), 19-407, 19-408, and BOP § 10-306.

Both Mr. Sanderson and Bar Counsel filed exceptions to the hearing judge's findings of fact and recommended conclusions of law. In terms of his factual findings, both parties agree that the hearing judge incorrectly determined that Mr. Sanderson owed one of his clients, Ms. Sharon Ozel, $6,900 instead of $4,900. Mr. Sanderson also took exception to several of the hearing judge's conclusions of law, and each will be discussed at length within our analysis. Bar Counsel's sole exception to the hearing judge's conclusions of law concerned the hearing judge's failure to find that Mr. Sanderson violated MLRPC 8.4(d). In terms of an appropriate sanction, Bar Counsel urged this court to disbar Mr. Sanderson; whereas, Mr. Sanderson recommended a more lenient sanction – a six-month suspension with an ability to reinstate once he satisfies certain conditions.

This Court held oral argument in the matter on April 5, 2019. Although Larry Rogers, Esq., entered his appearance as counsel to represent Mr. Sanderson in these

---

[2] The hearing judge failed to specify which subsection of MLRPC 3.4 Mr. Sanderson violated.

2

proceedings and although Mr. Rogers was present at oral argument, Mr. Sanderson argued on his own behalf.  By per curiam order dated April 5, 2019, we disbarred Mr. Sanderson.  In this opinion, we explain the reasons for that order.

## BACKGROUND

We summarize the hearing judge's findings of fact and the record submitted at the attorney grievance hearing as follows.

### *Mr. Sanderson's Legal Practice*

Mr. Sanderson has been a member of the Bar of Maryland since 2005.  He operates as a solo practitioner with offices in Baltimore City and Silver Spring.  His practice has primarily focused on child in need of assistance ("CINA") cases, personal injury, criminal and immigration cases. Throughout the events described herein, Mr. Sanderson maintained a Maryland attorney trust account with Wells Fargo Bank, N.A. ("Wells Fargo").

### *Bar Counsel Docket No. 2013-297-04-14*

The first complaint against Mr. Sanderson originated from his representation of a client, Olugboyega O. Odubanjo before Judge Patricia Mitchell of the District Court of Maryland sitting in Montgomery County.  In short, Mr. Sanderson failed to appear in court on behalf of Mr. Odubanjo.  As a result, Judge Mitchell filed a complaint against him with Bar Counsel.

On January 24, 2013, Mr. Odubanjo was charged with three potentially incarcerable traffic offenses.  Mr. Odubanjo's initial trial date was set for August 9, 2012.  After appearing before the court without counsel, Mr. Odubanjo requested a continuance so that

he could retain counsel. The district court granted the continuance and rescheduled the hearing for January 24, 2013.

The day before Mr. Odubanjo's trial, i.e., January 23, 2013, Mr. Sanderson filed a motion for continuance and an entry of appearance on behalf of Mr. Odubanjo.[3] In the motion, Mr. Sanderson explained that he was unable to participate in the hearing scheduled for the following day because of a scheduling conflict. Further, Mr. Sanderson entered his appearance of Mr. Odubanjo the day prior to trial, knowing full well he would be unable to appear before the court if his motion were denied. On the morning of January 24, 2013, the district court denied the motion because the court determined that Mr. Sanderson's action of "accepting a case knowing of [ ] existing, conflicting trial dates did not constitute good cause for a [second] continuance."[4]

Unaware of the motion or its denial, Mr. Odubanjo appeared before the district court on January 24, 2013. When Mr. Odubanjo's case was called, Judge Mitchell delayed the hearing in attempt to locate Mr. Sanderson. Ultimately, Mr. Sanderson failed to appear on behalf of Mr. Odubanjo despite Judge Mitchell's denial of his motion for continuance. Mr. Sanderson's absence caused further delay in the resolution of Mr. Odubanjo's case and required the court to schedule a third hearing. Consequently, Mr. Odubanjo then

---

[3] In Mr. Sanderson's entry of appearance, he indicated that he began representing Mr. Odubanjo on January 18, 2013. However, the motion was not filed in the district court until January 23, 2013.

[4] February 18, 2013 Letter from Judge Patricia Mitchell, District Court of Maryland, Montgomery County to the Attorney Grievance Commission of Maryland.

terminated Mr. Sanderson's representation, and Judge Mitchell filed a complaint with Bar Counsel regarding Mr. Sanderson's conduct.

On March 14, 2013, after receiving Judge Mitchell's complaint, Bar Counsel sent a letter to Mr. Sanderson requesting he explain in writing why he failed to appear in court on Mr. Odubanjo's behalf. The communication indicated that Bar Counsel required additional information to determine whether the matter should be classified as a formal documented complaint or non-disciplinary in nature. Additionally, Bar Counsel's letter provided Mr. Sanderson with fifteen days to respond to the request. In a letter dated April 29, 2013, Mr. Sanderson provided Bar Counsel with an untimely response. Therein, he represented that he understood his actions were inappropriate but argued they were driven by a desire to assist Mr. Odubanjo.

In correspondence dated March 14, 2013, Bar Counsel informed Mr. Sanderson that his case required additional review to determine whether he violated provisions of the MLRPC throughout his representation of Mr. Odubanjo. On May 23, 2013, Bar Counsel sent a letter to Mr. Sanderson that requested he provide Bar Counsel with a copy of his entire client file for Mr. Odubanjo. In the letter, Bar Counsel provided Mr. Sanderson with a fifteen-day period to respond. Again, Mr. Sanderson failed to respond in a timely manner. On July 3, 2013, Mr. Sanderson responded to Bar Counsel's request for Mr. Odubanjo's client file. In this correspondence, with reference to a client file corresponding to his representation of Mr. Odubanjo, Mr. Sanderson replied that "no such documents or documents [sic] exist[,]" and denied that Mr. Odubanjo ever retained him as his attorney. Mr. Sanderson continued by stating, "I attempt [sic] to get a postponement for Mr.

5

Odubanjo, and if that would have been granted we were to make arrangements for representation."

*Conditional Diversion Agreement*

On January 6, 2014, based on Mr. Sanderson's alleged misconduct in his representation of Mr. Odubanjo, Mr. Sanderson and Bar Counsel entered into a Conditional Diversion Agreement ("CDA"), pursuant to Maryland Rule 19-716.[5] The agreement was for a period of two years and therein Mr. Sanderson agreed that he had violated MLRPC 1.1 by failing to appear on behalf of Mr. Odubanjo. As a condition of his agreement with Bar Counsel, Mr. Sanderson consented to the appointment of a monitor. The monitor's role involved providing oversight of certain aspects of Mr. Sanderson's practice, conducting regular communication and meetings with Mr. Sanderson, and filing reports with Bar Counsel at specified intervals. Under the CDA, Mr. Sanderson was also required to attend two legal education courses sponsored by the Maryland State Bar Association ("MSBA"): one course focusing on managing a law office and a second concerning attorney trust account management. The Attorney Grievance Commission approved the CDA on February 14, 2014 and stayed the corresponding disciplinary matter.

From the time of the CDA until Bar Counsel filed a petition to revoke the CDA on April 25, 2017, Midgett S. Parker Jr., Esq. of the Law Office of Linowes & Blocher, LLP served as Mr. Sanderson's monitor. Within this period, Mr. Parker filed twelve reports

---

[5] At the time, Mr. Sanderson and Bar Counsel entered into the CDA, the Rule authorizing and regulating CDAs was codified as Maryland Rule 16-736.

with Bar Counsel. During Parker's tenure as Mr. Sanderson's monitor, he met with and counseled Sanderson multiple times. Following the meetings, Mr. Parker would draft communications regarding Mr. Sanderson's progress and communicate his conclusions to Bar Counsel. In each report, Mr. Parker indicated that Mr. Sanderson was receptive to his suggestions and guidance.

Over the two-year time frame of the CDA, Mr. Sanderson completed several of the requirements. Despite this, the twelfth and final report by Mr. Parker, dated September 12, 2016, noted that Mr. Sanderson failed to attend any courses sponsored by the MSBA involving law office and attorney trust account management. On December 15, 2016, Bar Counsel sent a letter to Mr. Sanderson advising of his failure to comply with the CDA. At the time, Mr. Sanderson did not respond to or contest Bar Counsel's assertion. Consequently, Bar Counsel revoked the CDA and lifted the stay on the underlying disciplinary proceedings. While Mr. Parker monitored Mr. Sanderson, Bar Counsel received four other complaints against Mr. Sanderson. Bar Counsel engaged in further investigation into two of the four complaints.

*BC Docket No. 2017-0152*

Shortly after Bar Counsel sent notice to Mr. Sanderson regarding his failure to comply with the CDA, Bar Counsel received a communication from Wells Fargo notifying it of an overdraft on Mr. Sanderson's attorney trust account in the amount of $114.83. On January 25 and March 7, 2017, Bar Counsel sent letters to Mr. Sanderson which informed him that Bar Counsel was aware of the overdraft on his attorney trust account, requested a complete explanation of the overdraft, and requested access to records concerning Mr.

7

Sanderson's attorney trust accounts. In both correspondences, Bar Counsel requested that Mr. Sanderson respond within ten days. However, Mr. Sanderson failed to respond to either of Bar Counsel's inquiries. On April 10, 2017, Bar Counsel issued a subpoena requesting that Wells Fargo produce any and all records associated with Mr. Sanderson's trust account from January 1, 2016 until the date of the subpoena.

A month after Bar Counsel issued the subpoena, Mr. Sanderson left a voicemail for Bar Counsel in which he stated that he could "submit the documents next week." Bar Counsel returned Mr. Sanderson's call, was unable to reach him, and left a voicemail. On May 11, 2017, Bar Counsel wrote again to Mr. Sanderson, mentioned the voicemail, and requested that Mr. Sanderson provide the requested documents by May 19, 2017. On June 15, 2017, Bar Counsel sent a letter to Mr. Sanderson reiterating the contents of the previous letter and providing Mr. Sanderson with a revised deadline to supply the documents – June 25, 2017. In the correspondence, Bar Counsel also requested to be informed if Mr. Rogers was representing Mr. Sanderson in the instant disciplinary matter.

On June 19, 2017, Wells Fargo responded to Bar Counsel's subpoena and provided extensive records concerning Mr. Sanderson's attorney trust and operating accounts. On June 22, 2017, Mr. Rogers wrote to Bar Counsel but failed to clarify the reason for the overdraft. Instead, Mr. Rogers only indicated that the overdraft was related to a filing fee in a civil case and the deficiency had since been rectified. Additionally, Mr. Rogers referred to Mr. Sanderson's compliance, or lack thereof, with the CDA and stated his intention to discuss subsequent complaints filed against Mr. Sanderson with Bar Counsel at a later date. On July 13, 2017, Bar Counsel sent another correspondence to Mr.

Sanderson, and he again failed to respond. Altogether, Bar Counsel wrote Mr. Sanderson six times requesting an explanation for the overdraft.[6] With respect to each correspondence, Mr. Sanderson failed to timely respond, failed to offer an adequate explanation, and failed to provide any records associated with his attorney trust account.

In the interim, Charles E. Miller, IV, an investigator for the Attorney Grievance Commission, began to investigate Mr. Sanderson's attorney trust account records as a result of the overdraft notice provided by Wells Fargo. During the review, in addition to the overdraft that acted as a catalyst for the investigation, Mr. Miller determined that Mr. Sanderson engaged in several impermissible practices on multiple occasions, including: (i) making cash disbursements from his attorney trust account; (ii) transferring funds from his operating account into his attorney trust account; (iii) failing to maintain client funds in trust until earned; and (iv) using client funds to pay other clients.[7]

Mr. Miller determined that Mr. Sanderson's attorney trust account overdraft originated from his representation of Sharon Ozel. In 2015, Ms. Ozel retained Mr. Sanderson to represent her in a personal injury matter involving a car accident. Initially, Ms. Ozel met with Mr. Sanderson at the Juvenile Justice Center in Baltimore to discuss the representation. During the meeting, Mr. Sanderson failed to adequately explain to Ms.

---

[6] This includes the correspondences between Bar Counsel and Mr. Rogers after it learned that Mr. Rogers was representing Mr. Sanderson in this attorney discipline matter.

[7] The facts underlying some of the financial allegations against Mr. Sanderson will be detailed at great length within the relevant portion of our analysis to obviate any needless recitation of facts.

Ozel the amount of his fee, but she testified at the disciplinary hearing that she believed he would receive a $2,000 sum from any settlement or judgment in the matter. Mr. Sanderson later negotiated a settlement in Ms. Ozel's personal injury action.

In July 2016, Mr. Sanderson contacted Ms. Ozel and asked her to meet him at a movie theater in Owings Mills to provide her with a check for $2,000. Ms. Ozel testified that Mr. Sanderson had her sign a form to release the $2,000, and never informed her of the $6,900 settlement check from USAA. Nevertheless, the record reflects that Mr. Sanderson had her sign the settlement check and a form to release $2,000.00. However, he failed to provide Ms. Ozel with a copy of the form, never mentioned the $6,900 total, and did not provide her with the $2,000 check they had previously discussed.

The hearing judge determined that "[i]n late July 2016, [Mr. Sanderson] provided Ms. Ozel with an additional $2,000 and told her that money was still owed from a worker's compensation claim." Next, in December of 2016, Mr. Sanderson provided Ms. Ozel with a check for $2,900 which he represented emanated from a worker's compensation claim. Approximately a year later, while under investigation by Bar Counsel, Mr. Sanderson contacted Ms. Ozel. In a telephone conversation, Mr. Sanderson asked Ms. Ozel if she had been contacted by anyone regarding his representation of her. She informed him that, at the time, she had not been contacted by anyone. Approximately four or five days later, Ms. Ozel encountered Mr. Sanderson at the Baltimore City Juvenile Court. She testified that during this encounter, he again asked whether she had been contacted by anyone regarding his representation of her. He then instructed her that, if anyone were to contact her, she should inform them that she retained him in a different matter in addition to the

10

personal injury matter, later changed her mind, and requested that he refund the $2,900. The record reflects that Ms. Ozel never retained Mr. Sanderson in another matter and therefore the statement he urged her to provide to any potential investigators was patently false. He then requested that Ms. Ozel repeat the information back to him in an apparent attempt to ensure that she memorized the narrative of falsehoods. According to Ms. Ozel's testimony, approximately one month later, he called her again. When she answered, he told her "I'm sorry," and then hung up the phone.

Mr. Miller's review of the financial records associated with Mr. Sanderson's attorney trust account revealed that Mr. Sanderson had mismanaged client funds for several of his clients including Darren Parham and Duane Wilkinson. First, Mr. Miller determined that Mr. Sanderson used funds belonging to one client, Darren Parham, and used them to pay another client, Mattie Hines.

During his representation of Mr. Wilkinson, Mr. Sanderson received a settlement check for $40,000 from the Cincinnati Insurance Company. On November 28, 2016, he deposited the check into his attorney trust account. Of these funds, Mr. Sanderson paid Mr. Wilkinson $22,933.28. After disbursing his fee in the matter, funds remained in the trust account stemming from Mr. Sanderson's representation of Mr. Wilkinson. The record does not reflect the eventual fate of these funds.

*BC Docket No. 2016-1374*

Toumany Sangare is an immigrant from Guinea and was a resident of Montana at all times relevant to these grievance proceedings. In 2005, Mr. Sangare married a United States citizen, and his wife filed with United States Citizenship and Immigration Services

11

("UCIS") a Petition for Alien Relative ("I-130") and an Application to Register Permanent Residence or Adjust Status ("I-485") on his behalf in March of 2006. On September 16, 2010, UCIS denied Mr. Sangare's I-130 and I-485 petitions and referred Mr. Sangare for removal proceedings. On December 1, 2010, the U.S. Immigration Court held a hearing on Mr. Sangare's removal proceedings. At the removal hearing, the court granted Mr. Sangare a continuance to allow him opportunity to retain counsel. Mr. Sangare's next hearing was then scheduled for March 16, 2011. On that date, the court granted Mr. Sangare a second continuance and rescheduled the hearing for July 6, 2011.

On June 22, 2011, Mr. Sangare remarried.[8] On the date scheduled for Mr. Sangare's hearing, Mr. Sanderson filed a motion for continuance and a notice of entry of appearance on behalf of Mr. Sangare, dated June 28, 2011. In his motion, Mr. Sanderson represented that he had another court appearance on the same date and at the same time in the District Court of Maryland Sitting in Baltimore County. Mr. Sangare appeared before the court without counsel and the court continued the matter until August 24, 2011. On August 11, 2011, Ms. Hamrick, Mr. Sangare's new wife, filed a new I-130 petition on Mr. Sangare's behalf.

The court held Mr. Sangare's removal hearing on August 24, 2011. When the case was initially called, both Mr. Sangare and Mr. Sanderson failed to appear. Therefore, the court moved the case to the end of its docket and, by the time the case was recalled, Mr.

---

[8] The record does not adequately reflect at what point Mr. Sangare's first marriage was terminated.

Sanderson appeared. In his interaction with the court, Mr. Sanderson conceded that Mr. Sangare was subject to removal but indicated that he would file another I-130 petition based on Mr. Sangare's second marriage. The record indicates that Mr. Sanderson failed to inform Mr. Sangare that he would not appear at the hearing.

In the interim, UCIS denied Mr. Sangare's second I-130 petition. The court provided Mr. Sanderson with notice of the denial, but he failed to advise Mr. Sangare of it or its significance. On July 17, 2013, Mr. Sanderson and Mr. Sangare appeared again before the U.S. Immigration Court for a status hearing. There, the court requested the basis for UCIS' denial of Mr. Sangare's I-130 petition but Mr. Sanderson indicated that he had not yet had a chance to review it with his client and therefore was unable to respond to the court's inquiry. Thereafter, the court set the matter for a voluntary departure hearing.

On August 2, 2013, the court scheduled an individual hearing for Mr. Sangare for November 14, 2013 and sent notice of the hearing to Mr. Sanderson. Mr. Sanderson informed Mr. Sangare of the November hearing date. Afterwards, Mr. Sangare attempted to contact Mr. Sanderson to ascertain the time of the hearing. Mr. Sanderson failed to respond to Mr. Sangare's inquiry. On November 12, 2013, however, Mr. Sanderson called Mr. Sangare and inquired as to the time of the hearing. Mr. Sangare was unsure and informed Mr. Sanderson that he believed it would occur at 1:30 p.m. – the time at which the court had scheduled his prior hearings. Mr. Sangare asked Mr. Sanderson to confirm the time of the hearing and to contact him with that information but Mr. Sanderson ultimately failed to do so.

13

At the November 14, 2013 hearing, the court called Mr. Sangare's case; he and Mr. Sanderson were not present. As a result, the court deemed the case abandoned and entered an order of removal against Mr. Sangare. At 1:30 p.m., Mr. Sanderson and Mr. Sangare appeared before the court and learned of the order of removal. Mr. Sanderson filed a motion to re-open Mr. Sangare's case but ultimately failed to provide the court with any required supporting affidavits. The court denied the motion on December 3, 2014. In the interim, Mr. Sanderson filed an appeal on behalf of Mr. Sangare.

On June 20, 2016, the United States Board of Immigration Appeals denied Mr. Sangare's appeal. On July 11, 2016, Mr. Sangare filed a complaint against Mr. Sanderson with Bar Counsel. On July 18, 2016, Bar Counsel forwarded a copy of the complaint to Mr. Sanderson and requested that he provide a written response within fifteen days of receipt. Mr. Sanderson failed to reply in a timely manner in writing. Therefore, Bar Counsel sent another correspondence to Mr. Sanderson via certified mail requesting that Mr. Sanderson respond to the complaint within ten days. On approximately August 22, 2016, Mr. Sanderson's agent received the correspondence. Mr. Sanderson again failed to provide a timely response to Bar Counsel's inquiry. On September 16, 2016, Bar Counsel wrote to Mr. Sanderson yet again, including copies of the prior correspondences, advising him that an investigation was forthcoming, and requesting a response within ten days. Again, Mr. Sanderson failed to provide a timely response to Bar Counsel's correspondence.

*BC Docket No. 2015-2413*

On November 26, 2015, Mr. Sanderson was representing the parent of a child in a CINA case at a hearing before the Circuit Court for Baltimore City. Tuesday Racquel

14

Isom-Cyrus, a social worker for Baltimore County Department of Social Services ("BCDSS"), testified at the hearing. After the hearing ended, Mr. Sanderson approached Ms. Isom-Cyrus in the hallway outside of the courtroom and, after a brief but heated exchange of words, he called her a "baby-snatching bitch."

On November 30, 2015, Ms. Isom-Cyrus filed a complaint against Mr. Sanderson with Bar Counsel in reference to the incident that occurred four days earlier. On December 10, 2015, Bar Counsel sent a correspondence to Mr. Sanderson regarding Ms. Isom-Cyrus' complaint and requested that he respond within ten days. Mr. Sanderson failed to respond to Bar Counsel's inquiry in a timely manner. Therefore, Bar Counsel wrote to Mr. Sanderson again requesting that he respond within ten days. Again, Mr. Sanderson failed to provide Bar Counsel with a timely response. After failing to obtain a response from Mr. Sanderson, Bar Counsel wrote to Mr. Parker, Mr. Sanderson's monitor, requesting Mr. Sanderson provide a response to their inquiries. In a letter dated January 19, 2016, Mr. Sanderson responded to Bar Counsel's previous communications and indicated that he did not recall using any profanity toward Ms. Isom-Cyrus.

On February 3, 2016, Bar Counsel sent another letter to Mr. Sanderson requesting additional information regarding his interaction with Ms. Isom-Cyrus. Mr. Sanderson failed to respond to the request. Accordingly, on March 15, 2016, Bar Counsel wrote to Mr. Sanderson again and requested that he provide the additional information requested in the prior correspondence. On April 27, 2016, Mr. Sanderson contacted Bar Counsel and requested an extension of time to provide the information. However, Mr. Sanderson ultimately did not comply with this extension and he failed to respond to Bar Counsel's

15

communication.  Therefore, on June 15, 2017 Bar Counsel wrote to Mr. Sanderson again requesting that he provide additional information within ten days.  Again, Mr. Sanderson failed to respond, and on July 10 Bar Counsel re-issued the prior communication requesting a response.  On July 17 Mr. Sanderson responded to Bar Counsel's request and reiterated that he did not use any vulgarities towards Ms. Isom-Cyrus.

## STANDARD OF REVIEW

In attorney discipline proceedings, this Court reviews the hearing judge's findings of fact for clear error and reviews the hearing judge's conclusions of law without deference. *See* Md. Rule 19-741(b) (indicating that, in reviewing the hearing judge's findings of fact, this "Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses[,]" but where this Court reviews the hearing judge's conclusions of law, the de novo standard applies.).  *See also Attorney Grievance Comm'n v. Maldonado*, 463 Md. 11, 32-33 (2019); *Attorney Grievance Comm'n v. Ghatt*, 461 Md. 228, 261 (2018).  In cases where either party files exceptions to the hearing judge's findings of fact, this Court must determine whether the factual findings are supported by clear and convincing evidence.  Md. Rule 19-741(b)(2)(B); Md. Rule 19-727(c).  In addition, "Bar Counsel has the burden of proving the averments of the petition by clear and convincing evidence."  Md. Rule 19-727(c).

## DISCUSSION

### A. *Exceptions to the Hearing Judge's Findings of Fact*

Mr. Sanderson notes several exceptions to the hearing judge's findings of fact. Specifically, Mr. Sanderson takes exception to the hearing judge's findings regarding the

16

impetus for his entry into the CDA with Bar Counsel and the balance due to Ms. Ozel

stemming from Mr. Sanderson's representation of her in the personal injury action.

With regard to the first exception, Mr. Sanderson contends that the hearing judge

improperly determined that he entered into the CDA with Bar Counsel because of his

failure to provide competent representation to Mr. Odubanjo.  Instead, Mr. Sanderson

represents that he entered into the CDA primarily due to Bar Counsel's concerns over the

management and oversight of his law practice.  However, there is little merit to Mr.

Sanderson's exception.  The CDA itself is included in the record and sets forth the

circumstances surrounding Mr. Sanderson's entry into the CDA.  The document provides

the following summary of events which led to Mr. Sanderson's first encounter with Bar

Counsel and ultimately his entry into the CDA:

> In his representation of Olugboyega O. Odubanjo, the Respondent failed to provide competent representation.  Specifically, he failed to appear at trial on a motor vehicle matter on behalf of his client, Mr. Odubanjo, in the District Court of Maryland for Montgomery County before the Honorable Patricia Mitchell.  Mr. Odubanjo was charged with three (3) incarcerable traffic violations.  At the time Mr. Odubanjo retained [Mr. Sanderson], [Mr. Sanderson] was aware that he would be unable to appear at Mr. Odubanjo's scheduled hearing due to a conflict in which he had a court appearance on a separate client matter.  [Mr. Sanderson] assumed that a continuance of the hearing would be granted by the court.  [Mr. Sanderson] filed a motion for continuance the day before Mr. Odubanjo's hearing, which was denied by the court.  Subsequently, [Mr. Sanderson] did not appear at Mr. Odubanjo's hearing.  Mr. Odubanjo terminated [Mr. Sanderson's] representation. No refund was rendered to Mr. Odubanjo since he had not yet paid [Mr. Sanderson's] attorney's fee.

The CDA additionally indicates that Mr. Sanderson's conduct constituted a violation

MLRPC 1.1 and that "[b]y signing this Agreement, [Mr. Sanderson] acknowledges that he

has engaged in conduct that constitutes professional misconduct and warrants that he has

17

not concealed from or misrepresented to Bar Counsel any material facts pertaining to his conduct or to the Agreement." *Id.*

Therefore, the agreement clearly indicates that Mr. Sanderson's entry into the CDA was compelled by his representation of Mr. Odubanjo which ran afoul of MLRPC 1.1. Mr. Sanderson's exception to this particular finding is driven by a piecemeal review of the agreement and, to some extent, a mischaracterization of its contents. In particular, paragraph six of the agreement summarizes Mr. Sanderson's admissions with respect to the complaint originating from his representation of Mr. Odubanjo. It provides that Mr. Sanderson did not maintain a written calendar system and "did not have any training in law practice [management]." *Id.* Therefore, although Mr. Sanderson's entry into the CDA was in part caused by Bar Counsel's concerns over Mr. Sanderson's office procedures, these concerns became known to Bar Counsel through investigation of Mr. Sanderson's competency, or lack thereof, during his representation of Mr. Odubanjo.

Accordingly, we determine that the hearing judge did not err in determining the catalyst of Mr. Sanderson's entry into the CDA with Bar Counsel. The agreement itself indicates that, although Mr. Sanderson failed to establish sufficient management and oversight procedures within his legal practice, the primary causal thrust for Bar Counsel's initial investigation of Mr. Sanderson, which led to his eventual entry into the CDA, was Mr. Sanderson's representation of Mr. Odubanjo. Accordingly, Mr. Sanderson's exception as to this finding is without merit and therefore overruled.

Next, both Mr. Sanderson and Bar Counsel take exception to the hearing judge's finding regarding the total amount due to Ms. Ozel and the number of payments Mr.

18

Sanderson made to her. First, the hearing judge found that the total amount due to Ms. Ozel was $6,900 rather than $4,900. Before this Court, both Bar Counsel and Mr. Sanderson contend that the amount due to Ms. Ozel was actually $4,900, instead of $6,900. In his opinion, Judge Nugent found that "[i]n late July 2016, [Mr. Sanderson] provided Ms. Ozel with an *additional* $2,000.00[.]" (emphasis added). However, Ms. Ozel's testimony reflects that she only received two payments from Mr. Sanderson – one check for $2,000 in late July and another for $2,900 on December 12, 2016.

During the hearing, Ms. Ozel also testified that, although Mr. Sanderson neglected to discuss his fee with her in great detail, she understood that he would receive $2,000 from the settlement. Similarly, Mr. Sanderson agrees that the total amount owed to Ms. Ozel was $4,900. Although the settlement check from USAA General Indemnity Company ("USAA") was made payable to both Ms. Ozel and Mr. Sanderson, was for $6,900 the record indicates that $2,000 of the sum constituted Mr. Sanderson's fee and Ms. Ozel was only entitled to recover $4,900. Therefore, the hearing judge clearly erred with respect to the amount of money due to Ms. Ozel, and we therefore sustain this exception.

Another related exception involves the balance in Mr. Sanderson's escrow account during the period surrounding his receipt of funds from USAA and their disbursement. Mr. Sanderson argues that the hearing judge erred in finding that, two days after receiving the settlement check from USAA, Mr. Sanderson transferred $500 from the escrow account to his business account which brought the balance below the amount owed to Ms. Ozel. However, this is primarily based on and related to the hearing judge's error regarding the total amount of funds Mr. Sanderson owed to Ms. Ozel.

19

As mentioned above, Mr. Sanderson received the $6,900 settlement check from USAA on July 18, 2016 and deposited it into his attorney trust account. The next day, Mr. Sanderson transferred $2,000 of the settlement funds to his operating account. On July 20, Mr. Sanderson withdrew a second $2,000 from the trust account, with the memo "Garland Atty[.]" Based on the record before us, it is unclear as to which payment eventually made its way to Ms. Ozel, but we presume the transfer of funds on July 19 was likely associated with Mr. Sanderson's fee. Therefore, the $2,000 withdrawal the following day was likely Mr. Sanderson disbursing a portion of the settlement to Ms. Ozel.[9] After this withdrawal, his attorney trust account held $2,905.00.

Also, on July 20, Mr. Sanderson transferred $500 from the account to his business operating account. As a result, the balance in his attorney trust account dropped to $2,405.00, $495 less than the amount Mr. Sanderson owed to Ms. Ozel at the time. In fact, the balance remained below $2,900 until July 27, 2016, when Mr. Sanderson deposited $700 under Ms. Ozel's client name without any descriptive phrase or words in the memo line, which brought the attorney trust account's balance up to $2,905.

Ultimately, this surplusage of funds was short lived, because on August 4, 2016, Mr. Sanderson transferred $250 from his attorney trust account to his operating account, again under the client name of Ms. Ozel, but neglected to provide any indication as to its purpose. At this point, the balance in his attorney trust account fell to $2,605, leaving the

---

[9] As discussed later in our analysis, cash withdrawals from an attorney trust account are not permitted under the Maryland Rules governing attorney trust account management. *See* Md. Rule 19-410(b).

trust account underfunded with respect to the amount that Mr. Sanderson still owed Ms. Ozel. This pattern continued until Mr. Sanderson ultimately paid Ms. Ozel the $2,900 over four months later on December 12, 2016. In the interim, Mr. Sanderson would routinely receive client funds, withdraw or transfer portions of it, and allow the attorney trust account to become underfunded, with the account holding as little as $5 on September 26, 2016 and as much as $44,759.55 on December 1, 2016. Although the hearing Judge erred with respect to the total amount Mr. Sanderson owed to Ms. Ozel, he correctly identified that Mr. Sanderson's attorney trust account became underfunded, with respect to the amount that he owed Ms. Ozel, on the same day that Mr. Sanderson disbursed $2,000 to Ms. Ozel. Accordingly, we overrule this exception.

Next, Mr. Sanderson takes exception to the hearing judge's factual findings concerning potential misappropriation of funds from his former client, Ms. Brown. With reference to a monetary exchange between Mr. Sanderson and Ms. Brown, the hearing judge found Mr. Sanderson deposited a settlement check from the Maryland Automobile Insurance Fund ("MAIF") in the amount of $8,601.88 into his attorney trust account on June 28, 2016 which is adequately supported by the record. However, the same cannot be said for the hearing judge's ultimate determination regarding Mr. Sanderson misappropriating funds from Ms. Brown. The hearing judge found that, two days after the check was deposited, Mr. Sanderson withdrew $8,101.88 on June 30, 2016 and that "there is no evidence that payment was ever made to Ms. Brown." However, the hearing judge's finding is problematic in two respects.

21

First, in the initial complaint, Bar Counsel failed to raise any averments regarding Mr. Sanderson's potential misappropriation of funds from Ms. Brown. In fact, the only reference to Ms. Brown within the initial Petition is paragraph 53, which indicates that Mr. Sanderson provided a waiver of conflict agreement with regards to his representation of Ms. Brown. Aside from this, any allegations of misconduct regarding his representation of Ms. Brown are completely absent from the Petition. Previously, this Court has recognized that a hearing judge's findings must be appropriately limited to charges filed by Bar Counsel through the Petition. *Attorney Grievance Comm'n v. Seiden*, 373 Md. 409, 418-19 (2003); *Attorney Grievance Comm'n v. Monfried*, 368 Md. 373, 378-79 n. 7 (2002) (citing *In re Ruffalo*, 390 U.S. 544, 551 (1968)). Therefore, the hearing judge erred with respect to this determination. The purpose of limiting the hearing judge's findings to allegations contained within the complaint stems from procedural due process concerns. *In re Ruffalo*, 390 U.S. at 550. Particularly, this procedure is intended to ensure that an attorney is given fair notice of all of the charges filed against the attorney. *Id.*

In the instant grievance proceedings, Bar Counsel's Petition lacked any corresponding allegations of disciplinary action with respect to Mr. Sanderson's representation of Ms. Brown, and therefore, Mr. Sanderson was not adequately notified of the charges against him. Moreover, the finding is not sufficiently supported by the record. Although the records associated with Mr. Sanderson's attorney trust account do not indicate that the withdrawal made on June 30, 2016 was given to Ms. Brown, during Bar Counsel's deposition of Mr. Sanderson, he stated under oath that Ms. Brown accompanied him to the bank and received the payment upon withdrawal, because she did not hold a

22

checking account. He also indicated that the $500 discrepancy between the amount of the MAIF check and the withdrawal on June 30, 2016 corresponded to his fee in the matter. *Id.* In contrast, Bar Counsel failed to offer evidence, aside from copies of ledgers associated with Mr. Sanderson's attorney trust account, which demonstrates that Mr. Sanderson misappropriated funds from Ms. Brown. Accordingly, we sustain Mr. Sanderson's exception to this finding.

Lastly, Mr. Sanderson takes exception to the hearing judge's finding of fact emanating from his representation of Ms. Ozel. More specifically, he asserts that he did not promptly disburse $2,900 of settlement funds to her because he was in the process of settling a "boni [sic] fide lien from the Worker's Compensation fund[.]" In support of his position, Mr. Sanderson attaches to his exceptions a purported email from an individual associated with Chesapeake Employers Insurance Company. In this email, dated March 12, 2018, the individual represents to Mr. Sanderson that the insurance company should have recovered $1,437.10 from "[his] client[,]" but the organization allowed the client to retain the funds. However, there are several problems associated with this exhibit.

First, the email does not indicate that the communication is in reference to Mr. Sanderson's representation of Ms. Ozel. In all actuality, the email does not identify Ms. Ozel by name. The only potentially identifying information contained within the correspondence are usage of female pronouns in reference to the client and reference to one of Mr. Sanderson's clients receiving a third-party settlement in the amount of $6,900.00. The link between this email and Mr. Sanderson's representation of Ms. Ozel without more identifying information is tenuous. Nevertheless, other circumstances

23

surrounding this email and Mr. Sanderson's eventual payment to Ms. Ozel render unnecessary any further inquiry into this issue.

Although Mr. Sanderson submits that his payment to Ms. Ozel was significantly delayed due to the potential worker's compensation lien, the exhibit he provided and the associated timelines clearly demonstration that his contention is without merit. Particularly troubling, the email from Chesapeake Employers Insurance Company is dated March 12, 2018. However, Mr. Sanderson did not disburse the remaining $2,900 to Ms. Ozel until December 12, 2018. In the email, an employee of the insurance company informed Mr. Sanderson that Ms. Ozel will be able to retain the funds which, prior to this point, a question remained as to whether they would be subject to Injured Worker's Insurance Fund ("IWIF") withholding. Therefore, based on Mr. Sanderson's own exhibit, he received notice that there would be no withholding associated with Ms. Ozel's claim nine months before eventually releasing the funds to his client. Despite Mr. Sanderson's insistence that he had "a legitimate reason for not promptly dispersing [sic] the $2,900 in settlement funds to Ms. Ozel[,]" whatever legitimacy can be attributed to that reason ceased at some point after March 12, 2018. Mr. Sanderson offers no explanation for the nine-month delay in providing the funds to Ms. Ozel. Therefore, on this basis, we cannot conclude that the hearing judge clearly erred with respect to this finding. Accordingly, we overrule this exception.

## B. *Review of the Hearing Judge's Conclusions of Law*

In addition to Mr. Sanderson's exception to the hearing judge's findings of fact, he also takes exception to several of the hearing judge's conclusions of law. Specifically, Mr.

24

Sanderson takes exception to the hearing judge's conclusions that he violated: (i) MLRPC 1.1 in BC Docket No. 2012-297-04-14 by failing to provide competent representation to Mr. Odubanjo; (ii) MLRPC 1.1 in BC Docket No. 2017-0152 by failing to provide Ms. Ozel with competent representation; and (iii) MLRPC 1.2 by failing to recognize the scope of representation and the allocation of decision-making authority between attorneys and their clients.

In terms of exceptions to the hearing judge's conclusions of law, Mr. Sanderson first takes exception to several of the hearing judge's evidentiary rulings. Mr. Sanderson argues that the hearing judge erred when he permitted several pieces of evidence to be admitted, because the exhibits lacked appropriate evidentiary foundations. The records Mr. Sanderson contends were erroneously admitted by the hearing judge include: (i) bank records; (ii) communications from the Attorney Grievance Commission to Mr. Sanderson; and (iii) complaints from the Attorney Grievance Commission. In addition, Mr. Sanderson argues that the hearing judge erred in admitting records and testimony provided by Mr. Miller, because he was not properly qualified as an expert witness.

Mr. Sanderson first takes issue with the hearing judge's admittance of bank records that the Attorney Grievance Commission acquired from Wells Fargo through subpoena. In his exceptions filed with this Court, Mr. Sanderson fails to identify any specific basis upon which he takes exception to this evidentiary ruling. However, at the hearing, Mr. Sanderson objected to the introduction of the Wells Fargo Bank records on grounds that he was not informed of Bar Counsel's intent to introduce the bank records prior to the start of his hearing as required by the associated Rules.

Maryland Rule 5-803(b)(6) provides the following limitations on the admission of business records:

> (6) Records of Regularly Conducted Business Activity. A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

In close connection with this Rule, Maryland Rule 5-902(b)(1) establishes certain procedural steps that a party seeking to introduce business records under Rule 5-803(b)(6) must follow:

> (1) Procedure. Testimony of authenticity as a condition precedent to admissibility is not required as to the original or a duplicate of a record of regularly conducted business activity, within the scope of Rule 5-803 (b)(6) that has been certified pursuant to subsection (b)(2) of this Rule, provided that **at least ten days prior to the commencement of the proceeding in which the record will be offered into evidence, (A) the proponent (i) notifies the adverse party of the proponent's intention to authenticate the record under this subsection and (ii) makes a copy of the certificate and record available to the adverse party and (B) the adverse party has not filed within five days after service of the proponent's notice written objection on the ground that the sources of information or the method or circumstances of preparation indicate lack of trustworthiness.**

Md. Rule 5-902(b)(1) (emphasis added). The bank records in this case were accompanied by a form titled "Business Records Declaration" in which an employee of Wells Fargo Bank certified the authenticity of the records and indicated under the penalty of perjury that they were, in fact, business records.

26

Mr. Sanderson objected to the introduction and admission of bank records, obtained by Bar Counsel from Wells Fargo through subpoena, on the basis that he was not properly afforded notice of Bar Counsel's intent to introduce the documents under Rule 5-902(b)(1). Also at the hearing, Mr. Sanderson conceded that he received a copy of the bank records from Bar Counsel at his deposition which occurred on August 14, 2017.[10] In fact, as noted by Bar Counsel, Mr. Sanderson authenticated the records concerning both his attorney trust account and his operating account. Accordingly, because the records were certified by an employee of Wells Fargo, presented to Mr. Sanderson over a year before his hearing, and authenticated by Mr. Sanderson during his deposition, we overrule Mr. Sanderson's first exception to the hearing judge's evidentiary rulings.

Mr. Sanderson next takes exception to the hearing judge's admission of communications, i.e. letters, sent by Bar Counsel to Mr. Sanderson. Again, in his exceptions he does not specifically identify the grounds upon which he takes exception to the admission of these letters. However, at the hearing, Mr. Sanderson objected to admission of the documents on hearsay grounds.

Hearsay is defined as a statement made by an out of court declarant offered to prove the truth of the matter asserted. Md. Rule 5-801(c). As evident from the definition, the letters Bar Counsel wrote to Mr. Sanderson are not hearsay. Although the individual that drafted the letters by Bar Counsel to Mr. Sanderson, his attorney, and monitor did not

---

[10] Rule 5-902(b)(1) requires that the notification be performed at least ten days prior to the start of any proceedings. Mr. Sanderson's deposition occurred on August 14, 2017. His hearing occurred on November 27, 2018, over a year after his deposition.

testify in court, the record makes clear that these letters were not offered to prove the truth of the matter asserted. Although some of the later letters indicate that Mr. Sanderson had failed to respond to Bar Counsel's earlier communications, Bar Counsel clearly did not intend to introduce these exhibits to prove that Mr. Sanderson had failed to respond to their earlier communications or any violation of the MLRPC. Rather, these exhibits were intended to establish notice – that Mr. Sanderson was aware of the proceedings against him and was offered opportunity to respond.

Mr. Sanderson also takes exception to the introduction of testimony and records compiled by Mr. Miller, Bar Counsel's investigator, tasked with reviewing the records obtained from Wells Fargo. Mr. Sanderson argues that Mr. Miller acted as an expert witness in this capacity and the court erred by not requiring his qualification as an expert. However, we have held that individuals testify as expert witnesses where they opine in a particular matter on subjects which laypersons would typically be unable to grasp. *See Dorsey v. Nold*, 362 Md. 241, 257 (2001) (holding that a doctor was an expert witness rather than a fact witness where, in his testimony, he gave an opinion on the medical cause of a death).

The activities which Mr. Miller engaged in do not require any particular expertise in a subject-matter. Mr. Miller, in his role as investigator, reviewed the bank records obtained from Wells Fargo and placed some of this information, concerning Mr. Sanderson's trust account, in tables detailing the transactions. In this regard, Mr. Miller acted as a fact witness and merely noted data from the financial records and recorded this information in tables for greater ease of access. In his review, Mr. Miller offered no

expertise, merely reiterated numbers from the records, and the subject-matter did not require a particular level of expertise. Accordingly, Mr. Miller testified as a fact witness instead of an expert witness, as Mr. Sanderson contends. Therefore, we overrule Mr. Sanderson's exception on this point.

*MLRPC 1.1 Competency (BC Docket No. 2013-297-04-14)*

MLRPC 1.1 provides that, "[a]n attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." We have previously held that an attorney may violate this Rule in multiple ways. First, "the failure to pursue a claim after filing a complaint demonstrates not only incompetence, but also insufficient diligence." *Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 44 (2018) (quoting *Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 371 (2015)). In addition, "[a]n attorney [ ] violates MLRPC 1.1 by failing to attend a court appearance absent sufficient explanation." *Id.* (citing *Attorney Grievance Comm'n v. Storch*, 445 Md. 82, 87 (2015). *See also Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 180 (2015) ("[f]ailure to appear in court when expected to do so is a particularly egregious violation of MLRPC 1.1."); *Attorney Grievance Comm'n v. Walker-Turner*, 428 Md. 214, 226-27 (2012); *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 551 (2014) (commenting that "[c]ompetency includes, "at a minimum, the attorney's presence at any court proceeding for which he or she was retained, absent an acceptable explanation for that attorney's absence.").

Mr. Sanderson first argues that the hearing judge erred in finding that he failed to provide Mr. Odubanjo with competent representation. Specifically, he contends that the

hearing judge's finding is unsubstantiated because the record does not adequately reflect that his representation of Mr. Odubanjo failed to meet the requisite level of competence.

In the instant grievance proceedings, the record clearly reflects that Mr. Sanderson filed a motion for continuance and an entry of appearance on January 23, 2013, the day before Mr. Odubanjo's trial was scheduled to begin. Mr. Sanderson conceded that he would be unable to attend trial the following day. This demonstrates that Mr. Sanderson entered his appearance in the matter, on the day before trial, knowing full well that he would be unable to attend if his motion for continuance was not granted. Apparently, Mr. Sanderson expected the court would grant his motion for a continuance, which would enable him not to attend the hearing. Unfortunately for Mr. Sanderson, the court denied the postponement request and he failed to appear on behalf of Mr. Odubanjo despite filing his entry of appearance. Although Mr. Sanderson argues that his absence should be excused, because he was required to attend court in another part of the State contemporaneously with Mr. Odubanjo's hearing, he was fully aware of this at the time he entered his appearance. Therefore, based on our independent review of the record, we agree with the hearing judge that Mr. Sanderson violated MLRPC 1.1 in the course of his representation of Mr. Odubanjo.

*MLRPC 1.1 Competency (BC Docket No. 2017-0152)*

Next, Mr. Sanderson takes exception to the hearing judge's finding that, throughout his representation of Ms. Ozel, he violated MLRPC 1.1. Primarily, Mr. Sanderson contends that the record fails to sufficiently demonstrate that he did not provide competent representation to Ms. Ozel. He points out that Ms. Ozel obtained a reasonable settlement

30

and contends that he has offered a reasonable explanation as to why the $2,900 was not promptly paid to Ms. Ozel.[11]

However, Mr. Sanderson's exhibit does not provide a satisfactory explanation for the delay in providing Ms. Ozel with the funds. Although the exhibit provides an explanation for a portion of delay, as discussed above, the email from the IWIF clearing any worker's compensation lien and eliminating the possibility of any withholding against Ms. Ozel's recovery occurred in March. Mr. Sanderson did not provide her with the funds until December.

Overall, Mr. Sanderson violated MLRPC 1.1 in several ways with respect to Ms. Ozel. He violated this rule by unreasonably and without justification failing to promptly deliver the remaining settlement funds to Ms. Ozel. An attorney's failure to provide his or her clients with funds due implicates MLRPC 1.1. In prior cases, we have recognized that "failure to promptly deliver money to a client and to pay third parties demonstrates incompetence." *Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 369 (2015). *See also Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 357 (2005). We have also determined that MLRPC 1.1 is violated in situations where an attorney fails to inform a client that settlement funds have been received. *Id.* at 369.

Based on our independent review of the record, we agree with the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.1 in his representation of Ms. Ozel by

---

[11] Mr. Sanderson's explanation for the delay is discussed at length in our review of his exceptions to the hearing judge's legal conclusions. *See supra* at 23-24.

failing to initially inform her of receipt of the settlement funds and by unreasonably delaying full payment of the settlement funds to Ms. Ozel. Although Mr. Sanderson may have held a portion of the funds because of a potential workman's compensation offset, it was incumbent upon him to communicate this fact to Ms. Ozel. In addition, the six-month delay that elapsed between the date any potential workman's compensation issue was cleared and the date Mr. Sanderson eventually disbursed the remaining settlement funds to Ms. Ozel demonstrates Mr. Sanderson's incompetence. Accordingly, we agree with the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.1 in his representation of Ms. Ozel and overrule Mr. Sanderson's exception.

*MLRPC 1.1 Competency (BC Docket No. 2016-1374)*

The hearing judge concluded that Mr. Sanderson violated MLRPC 1.1 in his representation of Mr. Sangare. Specifically, the hearing judge found that Mr. Sanderson violated the rule by failing to appear at Mr. Sangare's removal hearing on July 6, 2011 and a voluntary departure hearing on November 14, 2012. In addition, the hearing judge determined that Mr. Sanderson violated the rule by failing to demonstrate adequate legal knowledge, skill, thoroughness, and preparation. The hearing judge found that this failure was evident through several of Mr. Sanderson's actions including: (i) his failure to timely review the order denying Mr. Sangare's I-130 Petition; (ii) Mr. Sanderson's failure to include evidence of exceptional circumstances when he filed a motion to re-open Mr. Sangare's case; and (iii) arguing under the incorrect standard in his motion to re-open.

This Court has previously indicated that an "[a]ttorney's failure to appear at clients' hearings, or to perform agreed-upon services on clients' behalf violated [MLRPC 1.1 and

1.3.]" *Attorney Grievance Comm'n v. Shakir*, 427 Md. 197, 205 (2012). *See also Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 403 (2001) (determining that competence under MLRPC 1.1 "necessarily includes, at a minimum, the attorney's presence at any court proceeding for which he or she was retained, absent an acceptable explanation for that attorney's absence[.]"). Mr. Sanderson failed to appear before the U.S. Immigration Court several times in his representation of Mr. Sangare which ultimately led to the court entering an order of removal against Mr. Sangare.

Despite his failure to appear before the court, Mr. Sanderson filed a motion to re-open Mr. Sangare's case. However, in his motion, Mr. Sanderson neglected to attach the necessary affidavits and incorrectly identified the applicable standard for such proceedings. Previously, we have held that "[e]vidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of [MLRPC] 1.1." *Attorney Grievance Comm'n v. Conwell*, 462 Md. 437, 462 (2019) (quoting *Attorney Grievance Comm'n v. McCulloch*, 404 Md. 388, 398 (2008)). Therefore, we determine that clear and convincing evidence supports the hearing judge's conclusion that Mr. Sanderson's conduct, in his representation of Mr. Sangare, violated MLRPC 1.1.

*MLRPC 1.2 (BC Docket No. 2013-297-04-14)*

Mr. Sanderson next excepts to the hearing judge's finding that he violated MLRPC 1.2(c).[12] The hearing judge found that Mr. Sanderson acted in violation of MLRPC 1.2 by

---

[12] Mistakenly, Mr. Sanderson takes exception to "[the hearing judge's] Conclusion of Law regarding Respondent's Scope of Representation and Allocation of Authority between Client and Lawyer" asserting that the hearing judge clearly erred. He asserts that "the record is devoid of any evidence by a clear and convincing standard that after consultation

33

limiting and conditioning his representation of Mr. Odubanjo. Particularly, Mr. Sanderson conditioned his representation of Mr. Odubanjo on his ability to obtain a postponement in the matter. Specifically, the hearing judge found that such action violated MLRPC 1.2(c). The rule, in pertinent part, reads as follows:

> (c) An attorney may limit the scope of the representation in accordance with applicable Maryland Rules if (1) the limitation is reasonable under the circumstances, (2) the client gives informed consent, and (3) the scope and limitations of any representation, beyond an initial consultation or brief advice provided without a fee, are clearly set forth in a writing, including any duty on the part of the attorney under Rule 1-324 to forward notices to the client.

MLRPC 1.2(c).

As evident, an attorney may make reasonable limitations to the scope of representation if they are communicated to the client in writing. The record contains no evidence that Mr. Sanderson provided Mr. Odubanjo with a written agreement indicating that his representation of Mr. Odubanjo would be conditioned on his ability to obtain the initial postponement. Therefore, at the outset, we determine that Mr. Sanderson failed to comply with MLRPC 1.2(c)(2) and (3). In addition to his failure to provide his Mr. Odubanjo with written notice of any limitations, Mr. Sanderson also violated MLRPC 1.2(c)(1). As the hearing judge noted, Mr. Sanderson attempted to condition his representation of Mr. Odubanjo on his ability to obtain a postponement in the matter.

---

with the client that [Mr. Sanderson] failed to abide by the client's decision." However, Mr. Sanderson's arguments overlook an important distinction. The hearing judge found that Mr. Sanderson violated MLRPC 1.2(c) which, as noted above, concerns limitations to the scope of representation. The hearing judge did not make a finding with regard to MLRPC 1.2(a), which would implicate the allocation of authority between client and attorney.

34

Considering that Mr. Sanderson entered his appearance and filed the postponement the day before Mr. Odubanjo's trial was scheduled to begin, we agree with the hearing judge that Mr. Sanderson unreasonably attempted to limit his representation of Mr. Odubanjo, in violation of MLRPC 1.2(c). Although Mr. Sanderson, in his exception, acknowledges that Mr. Odubanjo knew he would not appear court, this fact does not affect the unreasonable nature of Mr. Sanderson's decision to limit his representation of Mr. Odubanjo. As a result, Mr. Sanderson violated MLRPC 1.2 in his representation of Mr. Odubanjo.

*MLRPC 1.2 (BC Docket No. 2017-0152)*

Next, the hearing judge concluded that Mr. Sanderson violated MLRPC 1.2(a) in his representation of Ms. Ozel, by failing to consult with her regarding the status and eventual disbursement of settlement funds Mr. Sanderson received on her behalf. At the hearing, Ms. Ozel testified that she had never seen the settlement check, Mr. Sanderson had not provided her with a settlement disbursement sheet, and Mr. Sanderson failed to provide her with any document that identified the total settlement amount or the fee Mr. Sanderson would receive.[13] Ms. Ozel also testified that, in addition to this confusion, Mr. Sanderson neglected to inform her how much she would receive from the settlement. Based on Ms. Ozel's testimony, it is apparent that Mr. Sanderson failed to consult with her regarding the potential settlement. Such conduct constitutes a violation of MLRPC 1.2(a). *See Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 370 (2015). Therefore, we

---

[13] Although Ms. Ozel testified that there was some ambiguity as to the amount of Mr. Sanderson's fee, she testified that she believed he would receive $2,000.

35

determine that the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.2(a) in his representation of Ms. Ozel is supported by clear and convincing evidence.

*MLRPC 1.3 (BC Docket No. 2017-0152)*

MLRPC 1.3 establishes standards concerning the necessary diligence that must exist within the attorney client relationship and provides that, "[a]n attorney shall act with reasonable diligence and promptness in representing a client." This rule may be implicated by an attorney's failure to appear before a court absent sufficient reason. *Attorney Grievance Comm'n v. Butler*, 426 Md. 522, 534 (2012); *Attorney Grievance Comm'n v. Byrd*, 408 Md. 449, 459, 484 (2009) (holding that an attorney's failure to attend court proceedings constitutes a violation of both MLRPC 1.1 and 1.3). Undoubtedly, Mr. Sanderson's failure to appear for Mr. Odubanjo's hearing constitutes a violation of MLRPC 1.3. *Attorney Grievance Comm'n v. Walker-Turner*, 428 Md. 214, 229 (2012) ("Even a single, inadvertent failure to appear at a hearing may constitute actionable neglect of a legal matter.")

As indicated above, Mr. Sanderson filed his entry of appearance and a motion for continuance the day before Mr. Odubanjo's trial was scheduled to begin. Despite having a potential reason for his absence, Mr. Sanderson's conduct demonstrates an underlying lack of diligence especially considering the temporal proximity of his motion and entry of appearance in relation to the start of Mr. Odubanjo's trial. As a result, the hearing judge's determination that Mr. Sanderson violated MLRPC 1.3 in his representation of Mr. Odubanjo is supported by clear and convincing evidence.

36

*MLRPC 1.3 (BC Docket No. 2017-0152)*

The hearing judge also found that Mr. Sanderson violated MLRPC 1.3 in his representation of Ms. Ozel by failing to disburse settlement proceeds in a timely fashion. Our review of the record indicates that Mr. Sanderson fails to offer sufficient evidence to justify the delay in disbursement of the settlement proceeds. Even assuming he withheld these funds due to a potential worker's compensation lien, Mr. Sanderson failed to provide Ms. Ozel with information concerning the status of this work and nine months ultimately elapsed between any potential worker's compensation offset being cleared and Mr. Sanderson eventually distributing the settlement proceeds to Ms. Ozel. An attorney runs afoul of MLRPC 1.3 where he or she fails "to keep a client informed about the client's case, to promptly disburse settlement funds, or to respond to reasonable requests for information[.]" *Smith*, 443 Md. at 371. Here, Mr. Sanderson failed to keep Ms. Ozel informed and failed to promptly disburse settlement funds owed to her. As a result, we conclude that Mr. Sanderson violated MLRPC 1.3.

*MLRPC 1.3 (BC Docket No. 2016-1374)*

In addition to the two prior violations of MLRPC 1.3, the hearing judge also found that Mr. Sanderson violated the Rule in his representation of Mr. Sangare by failing to appear at two immigration hearings held on July 6, 2011 and November 14, 2013.[14] As

---

[14] The record reflects that Mr. Sanderson failed to appear before the immigration courts on multiple occasions: (i) July 6, 2011; (ii) August 24, 2011; (iii) and November 14, 2013. With respect to the hearing on August 24, 2011, Mr. Sanderson failed to appear at the time the case was called. In response, the Court moved the case to the end of its docket and he appeared by the time the case was recalled.

established in our discussions of MLRPC 1.3 violations Mr. Sanderson committed with respect to his other clients, an attorney's failure to appear for a scheduled court date, absent excuse, generally constitutes a violation of MLRPC 1.3. *See Byrd*, 408 Md. at 459, 484. By failing to appear on behalf of Mr. Sangare, Mr. Sanderson violated this provision.

Mr. Sanderson also failed to act with diligence in his representation of Mr. Sangare by failing to keep Mr. Sangare informed regarding the status of his case and by failing to respond to Mr. Sangare's reasonable requests for information. *See Attorney Grievance Comm'n v. Heung Sik Park*, 427 Md. 180, 188 (2012) (determining that failure to keep a client informed as to the status of a case and failure to respond to a client's inquiries regarding a case constitute violations of MLRPC 1.3). For example, Mr. Sanderson failed to advise Mr. Sangare that his second I-130 was denied and failed to advise Mr. Sangare of the consequences emanating from its denial.

In addition, Mr. Sanderson called Mr. Sangare to inquire about the time of the hearing on November 14, 2013. First, this was information Mr. Sanderson should have been aware of. Mr. Sanderson, and not Mr. Sangare, received the notice of the hearing date from the court. Although atypical that an attorney would contact his or her client requesting scheduling information, nevertheless, at the end of the discussion Mr. Sangare asked Mr. Sanderson to confirm the time of the hearing and then relay this information back to him. Ultimately however, Mr. Sanderson failed to respond to Mr. Sangare's request, which eventually led to both Mr. Sanderson and Mr. Sangare appearing late for the hearing and the court entering an order of removal against Mr. Sangare. Accordingly,

38

clear and convincing evidence supports the hearing judge's determination that Mr. Sanderson violated MLRPC 1.3 in his representation of Mr. Sangare.

Regarding his representation of Ms. Brown and Mr. Wilkinson, the hearing judge determined that Mr. Sanderson violated MLRPC 1.3 by "failing to timely or ever disburse settlement proceeds to Ms. Brown or Mr. Wilkinson." However, Bar Counsel failed to allege any violations against Mr. Sanderson that contemplated his representation of Ms. Brown. Because a hearing judge's findings must be appropriately limited to charges filed by Bar Counsel through the Petition, we determine that the hearing judge erred in finding that Mr. Sanderson violated MLRPC 1.3 through his representation of Ms. Brown. *Seiden*, 373 Md. at 418-19; *Monfried*, 368 Md. at 378-79 n. 7 (citing *In re Ruffalo*, 390 U.S. at 551).

Mr. Sanderson violated MLRPC 1.3 in his representation of Mr. Wilkinson by failing to promptly deliver settlement proceeds to him. As discussed above, Mr. Sanderson received a substantial settlement on behalf of Mr. Wilkinson in November of 2016. The record indicates that part of this amount was used by Mr. Sanderson as attorney's fees, while another portion of the funds was to be paid to Mr. Wilkinson. The record does not indicate that the remaining funds were ever disbursed to Mr. Wilkinson. Such an unreasonable delay in disbursing settlement funds to a client indicates an attorney's lack of diligence. *Smith*, 443 Md. at 371. Therefore, the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.3 in his representation of Mr. Wilkinson is supported by clear and convincing evidence.

MLRPC 1.4 provides the following:

(a) An attorney shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0 (f) (1.0), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

In his representation of Mr. Odubanjo, Mr. Sanderson violated MLRPC 1.4 by failing to adequately communicate information to Mr. Odubanjo. As the hearing judge correctly noted, after Mr. Sanderson filed an entry of appearance and a motion for continuance in Mr. Odubanjo's traffic matter, Mr. Sanderson failed to adequately explain to Mr. Odubanjo that, upon entering his appearance in the matter, he was obligated to appear on Mr. Odubanjo's behalf. In fact, Mr. Sanderson's failure to communicate this circumstance contributed to Mr. Odubanjo eventually terminating his representation.

As mentioned above, Mr. Sanderson also failed to communicate to Mr. Sangare other things including the denial of his second I-130 petition, its significance, and the time of Mr. Sangare's hearing scheduled for November 14, 2013. Consequently, clear and convincing evidence supports the hearing judge's conclusion on this point.

*MLRPC 1.4 (BC Docket No. 2017-0152)*

In his representation of Ms. Ozel, Mr. Sanderson committed numerous violations of MLRPC 1.4. An attorney's failure to inform a client that he or she received a settlement check or failure to communicate the terms of a settlement constitutes a violation of MLRPC 1.4. *Attorney Grievance Comm'n v. Kapoor*, 391 Md. 505, 531-32 (2006). Ms. Ozel testified that, as to the $6,900 settlement check Mr. Sanderson received from MAIF, that he never informed her of the full settlement amount, never provided her with a settlement disbursement sheet, and failed to explain to her the amount she would receive after his fee had been accounted for. As a result, Mr. Sanderson's conduct in his representation of Ms. Ozel violated MLRPC 1.4 and the record is replete with evidence in support of hearing judge's conclusion.

*MLRPC 1.5 (BC Docket No. 2017-0152)*

MLRPC 1.5(c) places certain limitations on an attorney's ability to set and collect fees. The rule, in pertinent part, provides the following:

> (c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by section (d) of this Rule or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the attorney in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the attorney shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

41

The hearing judge determined that Mr. Sanderson violated MLRPC 1.5 in his representation of Ms. Ozel by failing to memorialize a contingency fee agreement. Further, the hearing judge determined that Mr. Sanderson violated the provision through his failure to provide Ms. Ozel with adequate information regarding the expenses associated with the representation, whether such expenses would be deducted before or after the contingent fee is calculated, and by failing to provide her with a written settlement statement.

The record contains a form entitled "attorney-client agreement" which summarizes certain aspects of Mr. Sanderson's representation of Ms. Ozel. However, the agreement is unsigned, does not contain an area for signatures, and does not contain Ms. Ozel's signature.[15] MLRPC 1.5 requires that any agreement regarding contingency fees must be reduced to writing and signed by the client.

There are several other shortcomings associated with Mr. Sanderson's representation of Ms. Ozel. As mentioned above, Mr. Sanderson did not provide Ms. Ozel

---

[15] Interestingly, the record contains a very similar attorney-client agreement between Mr. Sanderson and Mr. Wilkinson. However, the two differ in some slight respects. First, the attorney-client agreement for Mr. Wilkinson relates to a representation that occurred prior to Mr. Sanderson's representation of Ms. Ozel. Second, the agreement with Mr. Wilkinson contains an area for the party's signatures with instructions. The instructions indicate that "I/We have read this agreement and have been given a copy" followed by lines for the client's signature and the accompanying date. The form also contains a signature and date line intended for Mr. Sanderson's signature which is preceded by a line that indicates "[t]his agreement is valid when countersigned by the Attorney."

Moreover, it is quite curious that the agreement for Mr. Wilkinson would contain signature lines and instructions, whereas the agreement concerning Mr. Sanderson's representation of Ms. Ozel did not, especially considering that the parties entered into it prior to the corresponding agreement for Ms. Ozel.

with a settlement disbursement sheet – as contemplated by the final sentence of MLRPC 1.5. In fact, Ms. Ozel openly testified that she was unaware of the total amount of her settlement and never received such a document. Furthermore, no such document exists within the record, which adds additional weight to Ms. Ozel's testimony. For these reasons, we agree with the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.5 and determine that the conclusion is supported by clear and convincing evidence.

*MLRPC 1.15 (BC Docket No. 2017-0152)*

MLRPC 1.15 requires that attorneys safekeep the property of clients or third persons in some instances and provides the following limitations:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

(b) An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408 (b).

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, an attorney shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon

43

request by the client or third person, shall render promptly a full accounting regarding such property.

(e) When an attorney in the course of representing a client is in possession of property in which two or more persons (one of whom may be the attorney) claim interests, the property shall be kept separate by the attorney until the dispute is resolved. The attorney shall distribute promptly all portions of the property as to which the interests are not in dispute.

The hearing judge determined that Mr. Sanderson violated MLRPC 1.15(a), (b), (c), and (d) by transferring funds from his attorney escrow account to his operating account on several occasions, by failing to maintain records concerning the funds held for Ms. Ozel, and by failing to maintain her funds in trust account until earned.

As detailed above, Mr. Sanderson received a check from USAA in the amount of $6,900 on July 18, 2016. Within the two days, Mr. Sanderson transferred $2,000 of this amount to his operating account and withdrew $2,000 in cash at a Wells Fargo branch. According to the evidence and testimony adduced at the disciplinary hearing, after the initial payment to Ms. Ozel, Mr. Sanderson still owed her $2,900. Assuming *arguendo* the legitimacy of Mr. Sanderson's representation concerning the potential worker's compensation lien on the funds, the exhibit he provided indicates that the funds were cleared on March 12, 2018. However, Mr. Sanderson failed to disburse the remaining $2,900 to Ms. Ozel until December 12, 2018 – nine months later. During this period, the available balance within the trust account fell below $2,900 on several occasions. To interrupt the deficient trust balance, Mr. Sanderson transferred funds from his firm's operating account into the attorney trust account numerous times. In addition, the financial

44

records associated with Mr. Sanderson's attorney trust account indicate that he deposited cash into the account on several instances in amounts as large as $2,000.

Mr. Sanderson's failure to adequately maintain records concerning his attorney trust account add a certain degree of opaqueness to our review of the associated financial records. Within the proceedings below, Mr. Sanderson offered no documentary evidence which could have explained some of the deficiencies associated with his attorney trust account and specifically those concerning his representation of Ms. Ozel. Mr. Sanderson violated MLRPC 1.15(a) and (b) by failing to maintain adequate records of his attorney trust account and by depositing funds from his firm's operating account into his attorney trust account. *Attorney Grievance Comm'n v. Ross*, 428 Md. 50, 78-79 (2012) (holding that an attorney violated MLRPC 1.15 by failing to maintain adequate trust account records).

Mr. Sanderson violated MLRPC 1.15(b) by depositing funds from his operating account into his attorney trust account on several occasions. Maryland Rule 19-408 sets forth the limited situations in which an attorney may deposit funds into an attorney trust account which includes paying fees, service charges, minimum balance requirements, and funds that potentially belong to the attorney. The transfers here, however, fit none of these limited exceptions. Accordingly, we hold that Mr. Sanderson violated MLRPC 1.15(b).

Mr. Sanderson violated MLRPC 1.15(c) in his representation of Ms. Ozel by failing to maintain her funds in trust until they were earned. As detailed above, throughout his representation of Ms. Ozel, the level of funds within Mr. Sanderson's attorney trust account fell below the amount he owed to her, i.e. $2,900, on several occasions. The Rule provides

45

that an attorney "may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred." MLRPC 1.15(c). The deficient balance compared to the amount Mr. Sanderson still owed Ms. Ozel, demonstrates that Mr. Sanderson violated MLRPC 1.15(c).

In addition to these violations, Mr. Sanderson violated MLRPC 1.15(d) by failing to promptly deliver Ms. Ozel her settlement funds. Assuming *arguendo* the legitimacy of Mr. Sanderson's allegations concerning the potential worker's compensation lien on the funds, the exhibit he provided indicates that the funds were cleared on March 12, 2018. However, Mr. Sanderson failed to disburse the remaining $2,900 to Ms. Ozel until December 12, 2018 – nine months later. Mr. Sanderson offers no explanation aside from the worker's compensation issue to rectify this delay. Furthermore, Mr. Sanderson failed to inform Ms. Ozel of the settlement and its amount, as evidenced by her testimony. Therefore, Mr. Sanderson violated the provisions of MLRPC 1.15(d) in his representation of Ms. Ozel by failing to promptly deliver the settlement funds to her and by failing to promptly notify her of the terms of the settlement agreement.

The hearing judge also concluded that Mr. Sanderson violated this Rule in his representations of Mr. Wilkinson and Mr. Parham. Specifically, the hearing judge determined that Mr. Sanderson violated MLRPC 1.15(c) and (d) by failing to maintain their funds in trust until earned and by failing to promptly deliver settlement funds owed to them.

The record reflects that Mr. Sanderson continued in his habit of transferring funds from his operating account into his attorney trust account throughout his representation of Mr. Parham. Between March 27, 2017 and April 4, 2017, Mr. Sanderson transferred funds

from his operating account to his attorney trust account on six different occasions. In total, the transfers amounted to $1,400. More troubling however, is the payment made on March 31, 2017, in which Mr. Sanderson impermissibly paid a portion Mr. Parham's client funds to Ms. Hines.

With respect to Mr. Sanderson's representation of Mr. Wilkinson, Mr. Sanderson received a settlement check in the amount of $40,000 from the Cincinnati Insurance Company and deposited it into his attorney trust account on November 28, 2016. On December 3, 2016, Mr. Sanderson issued a check to Mr. Wilkinson for $22,933.28. Two days later, Mr. Sanderson transferred $9,967, accounting for his fee in the matter, from his attorney trust account to his operating account. Thereafter, $7,099.72 remained in the trust account stemming from Mr. Sanderson's representation of Mr. Wilkinson. The totality of evidence adduced throughout the course of these disciplinary proceedings does not indicate that Mr. Sanderson ever paid these remaining funds to Mr. Wilkinson. Therefore, clear and convincing evidence supports the hearing judge's conclusion that Mr. Sanderson violated MLRPC 1.15(c) and (d) throughout his representations of Mr. Wilkinson and Mr. Parham.

In addition to the violations of the MLRPC that originated from Mr. Sanderson's representation of Ms. Ozel, the hearing judge determined that Mr. Sanderson violated MLRPC 1.15(c) and (d) throughout his representation of Ms. Brown. The hearing judge determined that Mr. Sanderson violated this rule by failing to promptly deliver settlement funds owed to these clients. However, as mentioned above, Bar Counsel failed to allege

47

any violations with respect to Mr. Sanderson's representation of Ms. Brown.[16]  As noted above, the record contains scant evidence concerning Mr. Sanderson's representation of Ms. Brown.  Further, the record fails to demonstrate, by clear and convincing evidence, that Mr. Sanderson violated MLRPC 1.15 in his representation of Ms. Brown.  Accordingly, the hearing judge's contrary conclusion was premised upon error.

*Md. Rule 19-410 (BC Docket No. 2017-0152)*

Maryland Rule 19-410, establishes numerous restrictions on an attorney's ability to perform certain actions with funds held in an attorney trust account:

> (b) No Cash Disbursements. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.

> (c) Negative Balance Prohibited. No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

Md. Rule 19-410(b), (c).  The hearing judge concluded that Mr. Sanderson violated subsection (b) of this provision in his representation of Ms. Ozel by making several cash withdrawals from his attorney trust account.  However, the hearing judge failed to conclude that Mr. Sanderson violated subsection (c).[17]

---

[16] Out of due process constraints, our review focuses on the allegations established by the hearing judge that were raised in Bar Counsel's Petition.  Specifically, the only overlapping allegations between the hearing judge's conclusions of law and Bar Counsel's petition, with reference to MLRPC 1.15, are those concerning Mr. Sanderson's representation of Ms. Ozel.  *See supra* at 22-23.

[17] The hearing judge's failure to conclude that Mr. Sanderson violated subsection (c) is puzzling, because the initial complaint in this matter was based on Mr. Sanderson's failure

Nonetheless, the financial records associated with Mr. Sanderson's attorney trust account demonstrate that he made seven cash disbursements from his attorney trust account between June 30, 2016 and April 4, 2017.[18]  In total, these cash disbursements amounted to $15,201.88.   For that reason, we hold that the hearing judge's conclusion with respect to Maryland Rule 19-410(b) is supported by clear and convincing evidence.

*Md. Rule 19-407 (BC Docket No. 2017-0152)*

Maryland Rule 19-407 strengthens the trust afforded to the legal profession by mandating a lengthy list of records that an attorney must maintain with respect to his or her attorney client trust account:

(a) Creation of Records. The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

(1) Attorney Trust Account Identification. An identification of all attorney trust accounts maintained, including the name of the financial institution, account number, account name, date the account was opened, date the account was closed, and an agreement with the financial institution establishing each account and its interest-bearing nature.

(2) Deposits and Disbursements. A record for each account that chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

_____

to maintain a positive balance in his attorney trust account which the associated bank records definitively establish.  However, Bar Counsel did not except to the hearing judge's failure to make a conclusion as to whether Mr. Sanderson violated Maryland Rule 19-410(c); as such, we do not address the matter further.

[18] In addition to the cash disbursements, Mr. Sanderson cashed a $1,000 check made to the account on November 9, 2016.  This amount is not included in the total number of cash disbursements or the accompanying total of funds withdrew from the account as cash.

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of the disbursement, (ii) the amount, (iii) the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) Client Matter Records. A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) Record of Funds of the Attorney. A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408 (b).

(b) Monthly Reconciliation. An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as permitted by Rule 19-408 (b), and the adjusted month-end financial institution statement balance. The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

(c) Electronic Records. Whenever the records required by this Rule are created or maintained using electronic means, there must be an ability to print a paper copy of the records upon a reasonable request to do so.

(d) Records to be Maintained. Financial institution month-end statements, any canceled checks or copies of canceled checks provided with a financial institution month-end statement, duplicate deposit slips or deposit receipts generated by the financial institution, and records created in accordance with

section (a) of this Rule shall be maintained for a period of at least five years after the date the record was created.

In several correspondences to Mr. Sanderson throughout these disciplinary proceedings, Bar Counsel requested that he provide copies of ledgers, records, and client files. In response to these requests, Mr. Sanderson provided only purported retainer agreements for several clients and two "waiver of conflict" agreements. However, he failed to provide any records concerning his attorney trust account, and, therefore, the record is entirely devoid of any indication that Mr. Sanderson complied with Maryland Rule 19-407. Under these circumstances, we determine that the hearing judge's conclusion with respect to this issue is supported by clear and convincing evidence; Mr. Sanderson failed to adequately maintain records associated with his attorney trust account as required under Maryland Rule 19-407.

*Md. Rule 19-408 (BC Docket No. 2017-0152)*

(a) General Prohibition. An attorney or law firm may deposit in an attorney trust account **only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule.**

(b) Exceptions.

(1) An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 19-411 (b)(1)(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

51

(2) An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

(3) Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

Md. Rule 19-408 (emphasis added). The rule references Maryland Rule 19-404 for the types of items that must be deposited in an attorney trust account, which include the following:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

Further, the restrictive language of Maryland Rule 19-408(a) limits the type of items an attorney may deposit into an attorney trust account to those specifically provided in Maryland Rule 14-404. In the present disciplinary proceedings, the hearing judge determined that Mr. Sanderson violated Maryland Rule 19-408 by depositing funds from his business operating account into his attorney trust account on several occasions.

The record is replete with instances in which Mr. Sanderson transferred funds from his operating account to his attorney trust account. In fact, between March 15, 2016 and April 4, 2017, Mr. Sanderson transferred funds from his operating account to his attorney trust account more than nineteen times. These transactions totaled an amount of

52

$15,149.72. With the record containing such undisputed evidence, the hearing judge's conclusion that Mr. Sanderson violated Maryland Rule 19-408 is supported by clear and convincing evidence.

*BOP § 10-306 (BC Docket No. 2017-0152)*

In his conclusions of law, the hearing judge concluded that Mr. Sanderson violated BOP § 10-306 throughout his representation of several clients.[19] The provision provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." BOP § 10-306. We have held that an attorney violated this provision where he "used trust account funds for an unauthorized purpose, withdrew cash from the account, and created negative balances within multiple client accounts[.]" *Attorney Grievance Comm'n v. Mahone*, 451 Md. 25, 43 (2016).

First, Mr. Sanderson engaged in a practice of making numerous impermissible cash disbursements from his attorney trust account as discussed above in reference to his violation of Maryland Rule 19-410. Second, this practice resulted in the trust account becoming underfunded on several occasions with its balance falling into the negative and causing the overdraft in January of 2017. Third, Mr. Sanderson consistently transferred funds from his operating account to his trust account which is discussed at length in our

---

[19] In his opinion, the hearing judge indicated he was discussing BOP § 10-306 but quoted the text of BOP § 10-305 instead, which permits attorneys to withdraw funds from an attorney trust and to invest them in certain instances. Bar Counsel's Petition averred a violation of BOP § 10-306 and we note that this discrepancy appears to be a typographical issue and proceed in our analysis under the impression that the hearing judge intended to conclude Mr. Sanderson violated BOP § 10-306.

analysis of MLRPC 1.15. Therefore, the record clearly reflects that the hearing judge's conclusion that Mr. Sanderson violated BOP § 10-306 is supported by clear and convincing evidence.

*MLRPC 3.4 (BC Docket No. 2017-0152)*

MLRPC 3.4 concerns fairness to opposing parties and, in pertinent part, provides that an attorney may not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law[.]" MLRPC 3.4(b).

The hearing judge determined that Mr. Sanderson violated MLRPC 3.4(b) when he instructed Ms. Ozel to provide Bar Counsel with false information upon any subsequent inquiry into his representation. According to Ms. Ozel's testimony, Mr. Sanderson called her at some point after the meeting in Owings Mills and inquired as to whether she had been contacted or asked any questions regarding his representation of her. She testified that after the phone call she and Mr. Sanderson encountered one another at the Baltimore City Juvenile Court, where she worked. There, Mr. Sanderson again asked whether Ms. Ozel had been contacted by anyone in reference to his representation. In addition, he informed her that if anyone should contact her and ask questions regarding his representation of her, she should inform them that she "hired him for something else beside a car accident, and then [she] changed [her] mind and asked for the $2,900 back." She then testified that she did not retain Mr. Sanderson in another matter and the representation he urged her to make was in fact false.

Our review of the record clearly indicates that Mr. Sanderson contacted Ms. Ozel regarding the pending disciplinary proceedings. He was aware that she would likely be

54

called as a witness in the disciplinary proceedings and attempted to have her provide

misinformation to Bar Counsel to mitigate any disciplinary action taken. Therefore, Mr.

Sanderson attempted to persuade Ms. Ozel into providing false testimony to Bar Counsel

which directly contravened MLRPC 3.4(b). Accordingly, the hearing judge's conclusion

that Mr. Sanderson violated MLRPC 3.4(b) is supported by clear and convincing evidence.

*MLRPC 8.1 (BC Docket No. 2013-297-04-14)*

> An applicant for admission or reinstatement to the bar, or an attorney in
> connection with a bar admission application or in connection with a disciplinary
> matter, shall not:
> (a) knowingly make a false statement of material fact; or
> (b) fail to disclose a fact necessary to correct a misapprehension known by the
> person to have arisen in the matter, or knowingly fail to respond to a lawful
> demand for information from an admissions or disciplinary authority, except that
> this Rule does not require disclosure of information otherwise protected by Rule
> 19-301.6 (1.6).

MLRPC 8.1. *See also Attorney Grievance Comm'n v. Oswinkle*, 364 Md. 182, 188 (2001).

The hearing judge found that Mr. Sanderson engaged in multiple violations of MLRPC 8.1.

Primarily, the violations stem from Mr. Sanderson's failure to adequately respond to Bar

Counsel throughout the investigation.

Mr. Sanderson failed to respond to Bar Counsel's communication, dated December

15, 2016, which expressed Bar Counsel's intention to declare him in default of the CDA

and requested a written response. Second, Mr. Sanderson failed to respond to several

requests by Bar Counsel concerning the overdraft on his attorney trust account. Third, Mr.

Sanderson failed to respond to multiple written correspondences from Bar Counsel

regarding his behavior towards Ms. Isom-Cyrus.[20]  This Court has previously held that, where letters from Bar Counsel cite MLRPC 8.1 and put an attorney on notice that failure to respond would result in a violation, such letters constitute a "lawful demand" as envisioned by MLRPC 8.1.  *See Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 252-53 (2000).  *See also Heung Sik Park*, 427 Md. at 190.  As the letters sent to Mr. Sanderson contained this reference, and the record is devoid of evidence indicating that Mr. Sanderson timely responded to the majority of these communications, clear and convincing evidence exists supporting that hearing judge's conclusion that he violated MLRPC 8.1.

*MLRPC 8.4*

In addition to the above findings, the hearing judge also found that Mr. Sanderson violated subsections (a), (c), and (e) of MLRPC 8.4 which, in pertinent part, provides the following:

It is professional misconduct for an attorney to:

(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) knowingly manifest by words or conduct when acting in a professional capacity bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status when such action is prejudicial to the administration of justice, provided, however, that legitimate advocacy is not a violation of this section;

---

[20] The hearing judge's conclusions of law concerning Mr. Sanderson's behavior towards Ms. Isom-Cyrus will be analyzed in detail shortly hereafter.

However, Bar Counsel takes exception to the hearing judge's conclusions based on MLRPC 8.4. Specifically, Bar Counsel contends that the hearing judge erred in neglecting to find Mr. Sanderson in violation of MLRPC 8.4(d), where his conduct in the aggregate brings the profession into disrepute. We next determine the applicable provisions of MLRPC 8.4 that Mr. Sanderson violated.

First, Mr. Sanderson violated MLRPC 8.4(a) by violating several provisions of the MLRPC discussed at length above. Mr. Sanderson also engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of MLRPC 8.4(c) by misrepresenting to Ms. Ozel that she would receive $2,900 from a worker's compensation action and urging her to provide Bar Counsel with misinformation upon request. Mr. Sanderson's continued pattern of making cash withdrawals from his attorney trust account and reimbursing the account with funds transferred from his operating account are troubling and evince dishonesty. Moreover, Mr. Sanderson's conduct in paying Mr. Wilkinson's funds held in trust to Ms. Hines constitutes misappropriation. Such conduct directly violates MLRPC 8.4(c). *Attorney Grievance Comm'n v. Gage-Cohen*, 440 Md. 191, 201 (2014). Accordingly, clear and convincing evidence supports the hearing judge's conclusions that Mr. Sanderson violated MLRPC 8.4(a) and (c).

In addition, the hearing judge concluded that Mr. Sanderson ran afoul of MLRPC 8.4(e) by making disparaging remarks towards Ms. Isom-Cyrus in his interaction with her at the Circuit Court for Baltimore City. Several witnesses testified that Mr. Sanderson called Ms. Isom-Cyrus a "bitch[,]" while she testified that Mr. Sanderson referred to her as

a "baby-snatching bitch[.]"  At oral argument, Mr. Sanderson argued that the use of the term alone does constitute conduct sufficient to support a violation of the Rule.  He alluded to the casual usage of racial epithets in hip-hop music and argued that, in some usages, derogative terms can imply some level of respect rather than disdain.    However, Mr. Sanderson's comparison is inapt as his exchange with Ms. Isom-Cyrus in no way demonstrated any such level of respect.

When Mr. Sanderson made the disparaging remarks shortly after a CINA hearing in which Ms. Isom-Cyrus represented the BCDSS, he was acting within his professional capacity at the time.  Clearly, based on the verbiage alone, Mr. Sanderson in his exchange with Ms. Isom-Cyrus, knowingly manifested bias or prejudice based upon sex, through his words, while acting in a professional capacity in violation of MLRPC 8.4(e).  Accordingly, our independent review of the record leads us to conclude that the hearing judge's conclusion is supported by clear and convincing as to this violation.

Additionally, Bar Counsel takes exception to the hearing judge's legal conclusions premised upon MLRPC 8.4.  Specifically, Bar Counsel alleges that Mr. Sanderson's conduct, viewed in the aggregate, brings the legal profession into disrepute in contravention of MLRPC 8.4(d).  We agree with Bar Counsel and sustain the exception to the hearing judge's findings, because the record clearly reflects that Mr. Sanderson engaged in conduct that is prejudicial to the administration of justice.

MLRPC 8.4(d) prohibits an attorney from acting in a manner "that negatively impacts the public's perception of the legal profession." *Ghatt*, 461 Md. at 273-74 (citing *Attorney Grievance Comm'n v. Marcalus*, 442 Md. 197, 205, 112 A.3d 375 (2015)).  *See*

*also Attorney Grievance Comm'n v. Goff,* 399 Md. 1, 22 (2007) (commenting that MLRPC 8.4(d) is violated where attorney conduct "reflects negatively on the legal profession and sets a bad example for the public at large."). First, we have commented that "[a] failure by an attorney to appear in court at a hearing on behalf of his or her client constitutes conduct prejudicial to the administration of justice[.]" *Thomas*, 440 Md. at 556. Here, Mr. Sanderson failed to appear at several proceedings throughout his representations of Mr. Odubanjo and Mr. Sangare. Second, an attorney violates MLRPC 8.4(d) by mismanaging client funds, making cash withdrawals from an attorney trust account, failing to maintain records associated with an attorney trust account, creating a negative trust balance, and commingling personal funds with that of a client. *See Attorney Grievance Comm'n v. Mahone,* 451 Md. 25, 43 (2016). As detailed above, Mr. Sanderson engaged in all these violative practices. Accordingly, we sustain Bar Counsel's exception and find that Mr. Sanderson violated MLRPC 8.4(d).

## SANCTION

Next, we must determine the sanction to impose where an attorney commits a myriad of rule violations as found by the hearing judge in this case. The primary aim of sanctions is to protect the public and not to punish an attorney. *Attorney Grievance Comm'n v. Weiss*, 389 Md. 531, 547 (2005). *See also Attorney Grievance Comm'n v. Shyrock*, 408 Md. 105, 126 (2009) (commenting that sanctions are intended to "protect the public, deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession.")

In terms of a sanction, Bar Counsel urged this Court to disbar Mr. Sanderson due to the numerous violations of the MLRPC he committed. Whereas, Mr. Sanderson disagreed and contended that an appropriate sanction would entail a six-month suspension with an ability to reapply once he satisfied the conditions originally set forth in the CDA.

In fashioning an appropriate sanction in attorney disciplinary proceedings, "[w]e determine the appropriate sanction by considering the facts of the case, as well as balancing any aggravating or mitigating factors." *Attorney Grievance Comm'n v. Kremer*, 432 Md. 325, 337 (2013) (citing *Attorney Grievance Comm'n v. Whitehead*, 405 Md. 240, 262 (2008)). We often refer to Standard 9.22 of the American Bar Association's Standards for Imposing Lawyer Sanctions, which provides the following aggravating factors:

> prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct, including that involving the use of controlled substances.

We have previously explained that "[a]ggravating factors militate in favor of a more severe sanction[.]" *Kremer*, 432 Md. at 337.

Before the hearing judge, Bar Counsel argued that existence of ten aggravating factors compelled disbarment: (1) prior disciplinary offense; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) bad faith obstruction of the disciplinary proceeding; (6) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (7) refusal to acknowledge wrongful

60

nature of conduct; (8) vulnerability of victim; (9) substantial experience in the practice of law; and (10) indifference to making restitution. For the most part, the hearing judge agreed, finding that Bar Counsel had demonstrated the existence of nine of the aggravating factors. However, the hearing judge determined that Bar Counsel had failed to meet the burden of establishing the aggravating factor of substantial experience in the practice of law. Moreover, the hearing judge determined that Mr. Sanderson failed to present any mitigating evidence and, accordingly, found that Mr. Sanderson failed to establish any mitigating factors by a preponderance of the evidence. *See* Md. Rule 19-727(c). Based on our review of the record, we note the existence of several aggravating factors.

First, Mr. Sanderson was previously disciplined and received a reprimand on February 25, 2014, for violations of Rules 1.3, 1.4(a)(2), 3.2, and 3.4(c). Second, Mr. Sanderson demonstrated a dishonest or selfish motive throughout his representation of clients and his interactions with Bar Counsel. Mr. Sanderson failed to disclose to Ms. Ozel the amount or timing of her settlement and knowingly urged her to make false statements to Bar Counsel in an apparent effort to obfuscate his improper handling of settlement and client funds from Bar Counsel's view.

Third, Mr. Sanderson clearly engaged in an overarching pattern of misconduct. Throughout Bar Counsel's investigation, Mr. Sanderson consistently failed to respond to Bar Counsel's inquiries. Moreover, Mr. Sanderson engaged in the questionable practice of making impermissible cash withdrawals from his attorney trust account then supplementing the trust account's by transferring funds to it from his operating account. Additionally, Mr. Sanderson demonstrated a pattern of misconduct by failing to appear at

several court proceedings despite entering his appearance on behalf of Mr. Odubanjo and Mr. Sangare.

Fourth, as evident from our analysis above, Mr. Sanderson committed multiple violations of the MLRPC. Fifth, Mr. Sanderson demonstrated bad faith obstruction of the disciplinary proceeding in several respects. Mr. Sanderson failed to comply with the terms of the CDA, failed to comply with Bar Counsel's requests for information regarding his representation of several clients, and instructed Ms. Ozel to lie to Bar Counsel concerning the investigation. Sixth, Mr. Sanderson made false statements to Bar Counsel regarding his interactions with Ms. Ozel. He also engaged in deceptive practices by instructing Ms. Ozel to make misrepresentations to Bar Counsel. Seventh, Mr. Sanderson refused to acknowledge his behavior and the wrongful nature of his conduct.

Mr. Sanderson takes exception to the hearing judge's determination that Mr. Sangare was a vulnerable person, which undergirded his finding that factor (h) – the vulnerability of victim – was applicable.[21] American Bar Association, *Standards for Imposing Lawyer Sanctions*, § 9.22, Compendium of Professional Responsibility Rules and Standards (2012). However, contrary to Mr. Sanderson's position, "[w]e have recognized previously the special vulnerability of immigrants as clients[.]" *Thomas*, 440 Md. at 558 (citing *Attorney Grievance Comm'n v. Brisbon*, 422 Md. 625, 642 (2011)). Therefore,

---

[21] In his exceptions, Mr. Sanderson stylizes this argument as an exception to the hearing judge's finding of fact that Mr. Sangare was a vulnerable client. However, this argument is more appropriately viewed as an argument concerning aggravating and mitigating factors rather than an exception to factual findings.

considering Mr. Sangare's immigration status, Mr. Sanderson's exception on this point is without merit. We therefore overrule this objection.[22]

In contrast to aggravating factors, the existence of mitigating factors tends to lessen or reduce the sanction an attorney may face. *Kremer*, 432 Md. at 338. Standard 9.22 of the American Bar Association's Standards for Imposing Lawyer Sanctions also provides a non-exhaustive list of mitigating factors that we regularly consider within the context of attorney sanctions. The standard provides the following potential mitigating factors:

> (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g)character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) The respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) The recovery arrested the misconduct and recurrence of that misconduct is unlikely. (j) Delay in disciplinary proceedings; (k) Imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses

*Id. See also Attorney Grievance Comm'n v. Gordon*, 413 Md. 46, 63 (2010) (providing a non-exhaustive list of mitigating factors).

In attorney discipline cases, the burden of proving allegations raised in the Petition, by clear and convincing evidence, falls upon Bar Counsel. Md. Rule 19-727(c). However, where an attorney asserts the existence of a mitigating factors, the burden rests with that

---

[22] Lastly, we agree with the hearing judge's conclusion that Mr. Sanderson's experience in the practice of law does not constitute an aggravating factor.

attorney to prove them by a preponderance of the evidence.  *Id.*  Mr. Sanderson makes several arguments in favor of mitigation which he must have proven before the hearing judge by a preponderance of the evidence.  We find Mr. Sanderson's arguments regarding mitigation unpersuasive for several reasons.

First, he contends that, in his representation of Ms. Ozel, he provided her with additional legal services, i.e., obtaining a release of funds from the worker's compensation carrier, without additional attorney fees.  Mr. Sanderson's exception regarding the additional work he performed for Ms. Ozel neither fits easily into any of the above categories of mitigating factors nor within any recognized mitigating factor discussed within our case law.  However, when viewed in terms of its substance, Mr. Sanderson's argument on this point is most likely subsumed under the mitigating factor concerning the absence of a dishonest or selfish motive.  However, Mr. Sanderson failed to establish this mitigating factor by a preponderance of the evidence.  In support of his explanation that he performed additional work for Ms. Ozel, staving off a potential worker's compensation lien, Mr. Sanderson provides an email from a subrogation adjuster with the IWIF that cleared Ms. Ozel's settlement funds from any IWIF withholding.  Mr. Sanderson failed to provide any documentation which would show the amount of work he performed in releasing these funds or any expenditures throughout this period.

Second, Mr. Sanderson argues that, although he failed to comply with the CDA in its entirety, he worked with his CDA monitor for an additional eight months past its expiration. Mr. Sanderson's contentions on this point are largely misguided.  Although he may have met with his monitor beyond the time-period required by the CDA, he failed to

comply with several other conditions of the CDA. Specifically, Mr. Sanderson failed to attend the required professional development courses concerning office and escrow management. Mr. Sanderson argues that the courses were offered at times inconvenient for him, which explains why he was unable to complete them within the two-year term of the CDA. However, he did indicate that he participated in continuing legal education courses from external jurisdictions that are similar to those required under the CDA. Nonetheless, Mr. Sanderson's actions of working with his monitor beyond the expiration of the CDA are insufficient to constitute mitigating circumstances. A holding in Mr. Sanderson's favor would likely encourage other attorneys, within disciplinary proceedings, to pick and choose which terms of their CDAs to follow and for what duration. Such a result would likely frustrate attorney disciplinary proceedings and the purpose of CDAs overall.

Third, Mr. Sanderson argues that he was depressed and abusing alcohol throughout the time period in which these events occurred. Regarding mental disability or substance dependence, we have indicated,

> in cases of intentional dishonesty misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [MLRPC]. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

65

*Ghatt*, 461 Md. at 275-76 (quoting *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 413-14 (2001)). *See also Attorney Grievance Comm'n v. Kenney*, 339 Md. 578, 591 (1995) (holding that "absent truly compelling circumstances, alcoholism will not be permitted to mitigate where an attorney commits a violation of ethical or legal rules which would ordinarily warrant disbarment."); *Attorney Grievance Comm'n v. Williams*, 335 Md. 458, 474 (1994) ("[w]e have said that a sanction less severe than disbarment is not warranted absent evidence that the addiction, to a substantial extent, was the responsible, precipitating and root cause of the misappropriation.").

As demonstrated above, Mr. Sanderson misappropriated client funds throughout his practice of repeatedly withdrawing cash from his attorney trust account, then reimbursing the underfunded trust account by transferring funds from his operating account on several occasions. Mr. Sanderson provides us with no evidence confirming his struggles with alcoholism and depression or demonstrating that his struggles in managing his attorney trust and operating accounts were substantially attributable to them. We determine that he failed to adduce sufficient evidence linking any alcohol abuse or depressive disorders to his deficient performance and grievous professional failings as an attorney.

Fourth, after reiterating that he had worked with his monitor under the CDA past its expiration, Mr. Sanderson contends that the public has not been demonstrably harmed by his conduct, the financial allegations raised in the Petition do not stem from a complaint originating from the public, and that none of his clients are owed any reimbursement. However, our precedent reveals no distinction between situations where financial complaints originate from Bar Counsel, judges, or an attorney's clients. In fact, in this

66

case, Mr. Sanderson had three complaints filed against him by Judge Mitchell, Mr. Sangare, and Ms. Isom-Cyrus. Moreover, the allegations of Mr. Sanderson's financial misdoings stem from Bar Counsel's investigation into his attorney trust account following its overdraft. With Mr. Sanderson's misrepresentations to his clients, including Ms. Ozel, he obfuscated any financial concerns and reduced the likelihood that a client would have the necessary knowledge of Mr. Sanderson's violations concerning attorney trust accounts and client funds.

Lastly, Mr. Sanderson argues that he acted as an attorney without any additional allegations of misconduct between the time of the complained activity and Bar Counsel's filing of the Petition. As mentioned above, Bar Counsel filed the Petition on March 26, 2018. Although a lack of prior disciplinary record is a potential mitigating factor, Mr. Sanderson attempts to establish this mitigatory effect by arguing that he practiced law for a little over a year, after receiving Bar Counsel's complaint, without incident. However, twelve months of good behavior is insufficient to mitigate or overcome the litany of sanctionable conduct Mr. Sanderson committed. Therefore, Mr. Sanderson's brief period of not committing sanctionable conduct is insufficient to operate as a mitigating factor.

Disbarment is often warranted in situations where an attorney neglects or abandons clients, makes misrepresentations to clients and Bar Counsel, and knowingly misappropriates funds. *Attorney Grievance Comm'n v. Edwards*, 462 Md. 642, 712 (2019). We have previously held, that "[w]hen a pattern of intentional misrepresentations is involved, particularly those misrepresentations that attempt to conceal other misconduct by the attorney, disbarment will ordinarily be the appropriate sanction." *Attorney*

*Grievance Comm'n v. Framm*, 449 Md. 620, 667 (2016). In addition, "[c]onduct involving dishonesty, fraud, or deceit, carries the risk of the ultimate sanction by this Court." *Maldonado*, 463 Md. at 56 (internal quotation marks omitted) (quoting *Attorney Grievance Comm'n v. Keiner*, 421 Md. 492, 523 (2011). In his communications with Ms. Ozel, Mr. Sanderson engaged in such a pattern of intentional misrepresentations, which were made in attempt to cover up his prior transgressions and to interfere in Bar Counsel's investigation. Mr. Sanderson clearly demonstrated conduct characterized by dishonesty or deceit through his impermissible handling of client funds on numerous occasions.

In this case, we sustain the hearing judge's findings that Mr. Sanderson violated MLRPC 1.1, 1.2, 1.3, 1.4, 1.5, 1.15, 3.4, 8.1, and 8.4. In addition, we sustain the hearing judge's conclusion that Mr. Sanderson violated Maryland Rules §§ 19-410, 19-407, 19-408, and BOP § 10-306. Furthermore, Mr. Sanderson, as an attorney, failed to demonstrate the requisite competence, diligence, and communicative abilities required of the profession. Additionally, he engaged in a widespread pattern of misusing client funds, failing to properly maintain records associated with his attorney trust account, and engaged in conduct which has the potentiality to bring the profession into disrepute.

Based on our assessment of Mr. Sanderson's misconduct, the existence of aggravating factors, and the absence of any mitigating factors, we agree with Bar Counsel and hold that disbarment is the only appropriate sanction. For the above reasons, we disbarred Mr. Sanderson and awarded costs against him by per curiam order dated April 5, 2019.